UNITED STATES of America,
Plaintiff–Appellee,

v.

Anton Gregory ZUKAS,
Defendant–Appellant.

No. 87–1568.

United States Court of Appeals,
Fifth Circuit.

April 12, 1988.

Rip Collins, Austin, Tex., Mel Black, Miami, Fla., for defendant-appellant.

LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., James H. DeAtley, Asst. U.S. Atty., Austin, Tex., for plaintiff-appellee.

Before WISDOM, REAVLEY and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this appeal from his conviction for conspiring to possess with intent to distribute cocaine, Anton Zukas challenges the district court's denial of his motion to suppress evidence. We affirm.

I

Anton Zukas was charged with conspiring to possess with intent to distribute cocaine and entered a guilty plea conditioned upon the outcome of his suppression hearing. The court denied his motion to suppress the cocaine, which was found in the luggage of the passenger of the plane that Zukas had leased and flown from Miami to Texas. Zukas was sentenced to fifteen years imprisonment and fined $10,000. Zukas contends that the search was the result of a *de facto* arrest made without probable cause, thus violating fourth amendment search and seizure requirements. The district court found, however, that the search was based on reasonable suspicion, and was no more intrusive than that suspicion warranted.

Zukas and his passenger became the subject of an investigation by the Drug Enforcement Administration ("DEA") based upon their conformity with DEA drug-smuggler profiles. At the bench trial, the district court made the following findings of fact. The investigation began November 5, 1986, when a confidential informant contacted Robert Nestoroff, a narcotics agent with the Texas Department of Public Safety. The informant, known by Agent Nestoroff for three or four years, had supplied reliable and accurate information in the past. The informant told Nestoroff that Zukas and one passenger had arrived at the municipal airport in Austin, Texas, in a Piper Navaho aircraft, and paid in cash for refuelling. The informant noted that the plane had extended-range fuel tanks and that the passenger, a "Miami–Vice type," appeared very nervous, wore gold jewelry and carried a large amount of cash. The two men left for a hotel.

Agent Nestoroff, an experienced DEA agent, drove to the airport to look at the aircraft. He observed that, in addition to extended-range fuel tanks, it had tinted windows and high security locks. Nestoroff went to the hotel where he discovered that both men had paid cash for their rooms, requested 5:30 a.m. wake-up calls, and the passenger, a California resident, had made long-distance calls to California.

Nestoroff ran a computer check on the pilot of the plane and discovered that Zukas was a suspected narcotics smuggler who had previously been arrested in connection with a seizure of marijuana from an aircraft. Nestoroff also learned that the Pip-

er had been leased through Sun States Aviation, a legitimate business that provided the type of aircraft preferred by smugglers. He further discovered that the flight had originated in Miami and had flown to Austin via Tallahassee.

At trial Nestoroff testified that the aircraft used by narcotics smugglers are often equipped with extended-range fuel tanks, tinted windows and high security locks. He also testified that the suspects' route from Miami—a known drug-trafficking center—to California—another known trafficking center—via Austin, Texas, and their schedule—arriving late in the day and leaving early—were consistent with other smuggling operations with which he was personally familiar. In addition, the nervousness of the passenger, the facts that the men had paid cash for the fuel and hotel, that they arrived late in the day and planned to leave early the next (when police officers generally are not on duty) all supported the suspicion that these men might be smugglers.

■ Based upon the informant's observations of the suspects, his own observations of the aircraft, Zukas' prior history, the ownership of the aircraft and the flight schedule, Agent Nestoroff decided to return to the airport the next morning with two other officers and a dog trained in drug detection. While one officer and the dog waited farther away from the scene, Nestoroff and a fellow officer drove onto the tarmac in order to observe the men while they were engaged in preflight preparations. When it became apparent that the suspects were making final flight preparations, Nestoroff parked his car in front of the plane in a way that blocked its access to the runway. Nestoroff testified that at this point he approached the aircraft to perform a ramp check. A ramp check, authorized by state and federal law, permits officers of the Federal Aviation Administration ("FAA") or police to examine the pilot's and aircraft's licensing and certification to ensure that they conform to FAA regulations. Zukas furnished the appropriate documents, which Nestoroff examined and determined were valid. In-

stead of returning these documents, however, Nestoroff retained them and informed the pilot that the agents suspected that the aircraft was being used to transport controlled substances. Zukas stated that he did not know who owned the aircraft. Nestoroff left Zukas to continue his work, and went to the rear of the plane to talk with the passenger who had been speaking to a second officer. This officer had informed the passenger that the DEA agents suspected that the aircraft contained controlled substances, but also told him that he was not under arrest. Nestoroff learned at this time that this passenger had been travelling under a false name.

Nestoroff then asked Zukas if he would consent to a search of the aircraft. Zukas agreed and the passenger also consented to a search of his own bags. The agents found cocaine in the passenger's bag and placed both men under arrest. Zukas then informed the officers that the passenger had a second bag in the aircraft. This bag was also searched and found to contain cocaine.

## II

■ To analyze the appellant's fourth amendment contentions, we must determine first at what point a fourth amendment seizure occurred and then determine whether the particular intrusion caused by the seizure was justified by the requisite amount of suspicion supported by objective facts. The Supreme Court has identified three tiers of citizen-police contact for purposes of fourth amendment analysis. *United States v. Berry,* 670 F.2d 583 (5th Cir.1982). The first tier, communication between police and citizens, involves no coercion or detention and does not implicate the fourth amendment. An investigatory stop, at the second level of contact, is a brief seizure that must be supported by reasonable suspicion, that is "specific and articulable facts, which taken together with rational inferences from these facts reasonably warrant an intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Finally, a full scale

arrest must be supported by probable cause. *Berry*, 670 F.2d at 583.

■ The district court determined that seizure occurred when Nestoroff and the other agent parked their car in front of the plane for the purpose of conducting a "ramp check." [1] Clearly, when the police officers parked their car in front of the plane, approached the pilot and asked for identification and registration papers, then informed him, without returning those papers, that he was suspected of smuggling drugs, the police-citizen contact constituted more than mere communication. In view of the circumstances present here, we hold that at this point a fourth amendment seizure had occurred.

The critical question, however, is whether this seizure constituted a *Terry* stop, requiring only reasonable suspicion, or a *de facto* arrest, which would require probable cause. This determination depends upon whether the level of intrusion was justified given the totality of the circumstances and the government interest involved. *Berry*, 670 F.2d at 601, 602.

■ The line between a valid investigatory stop and an arrest requiring probable cause is a fine one. *United States v. Hanson*, 801 F.2d 757 (5th Cir.1986). Although there is no litmus test for making this determination, an investigation detention must last no longer than is necessary to effect the purposes of the stop and should employ the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). *See also United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

The district court determined that the government officers had reasonable suspicion to justify a *Terry* stop and that the search and seizure which followed was jus-

tified by this level of suspicion and did not amount to a *de facto* arrest. Zukas contends, however, that the government's actions were based primarily on Zukas's conformity to a drug-smugglers profile, rather than any particularized suspicion, so that the seizure was not based on a legitimate level of suspicion. He further claims that even assuming that a reasonable suspicion existed, the detention was so intrusive that it became a *de facto* arrest before probable cause was established and was therefore impermissible. We agree with the district court's analysis, however.

In *Berry*, this court determined the appropriate use of DEA profiles. The court noted that such profiles are primarily an administrative tool and consequently mere conformity with the characteristics of the drug-smugglers' profile does not necessarily provide reasonable suspicion. On the other hand,

> if an officer can demonstrate why some factor, interpreted with due regard for the officer's experience and not merely in light of its presence on the profile, was, in the particular circumstances of the facts at issue, of such import as to support a reasonable suspicion that an individual was involved in drug smuggling, we do not believe that a court should downgrade the importance of that factor merely because it happens to be part of the profile.

*Berry*, 670 F.2d at 600.

■ In this case, both Nestoroff and his fellow officer were experienced DEA agents who had particular experience with drug traffickers stopping in Austin and had the following information: (1) Zukas flew a small aircraft with extended-range fuel tanks, tinted windows and high security locks, the type often used by drug smugglers; (2) the aircraft was owned by a company which, though itself legitimate, often leases aircraft to drug smugglers; (3)

---

1. We recognize that, according to Nestoroff's own testimony, this ramp check may indeed have been a pretext and conducted only to further his investigation. Although Zukas therefore objects to the validity of the ramp check, this issue is disposed of in our opinion in *United States v. Causey*, 834 F.2d 1179 (5th Cir.1987) (en banc), which validated so-called pretextual arrest warrants. The reasoning of that case would also apply here to the use of a pretext for an investigatory stop. We continue our analysis, however, since the "stop" continued even after the pilot's documents had been verified, thus exceeding the bounds of the ramp check.

Zukas and his passenger paid cash for fuel and a hotel room, as is often done by drug smugglers; (4) the plane flew from Miami, a drug traffic center to Texas, and was apparently headed to California, another drug-trafficking area; (5) the passenger appeared nervous, wore gold jewelry and carried a large amount of cash; (6) calls had been made from their motel to California, and (7) Zukas had a prior drug-smuggling arrest and was a suspect of the DEA. Admittedly, several of these factors have no independent significance except that they fit the DEA's drug-smugglers' profile. Taken alone, no single factor would support a reasonable, particularized suspicion with regard to the activities of Zukas and his passenger. When these factors, however, are considered together with Zukas's prior record, the specific activities observed by the agent and informant, and the agents' level of experience and expertise, their significance renders the whole greater than the sum of its parts. When the officers began questioning Zukas and the passenger, therefore, the seizure was supported by reasonable suspicion and justified to the extent that it was no more than an investigatory stop.

■ The suspicion did not rise to the level of probable cause, though, until after Zukas and the passenger had consented to a search that resulted in the discovery of cocaine. Although both sides agree that the search was voluntary, it cannot be justified if the preceding level of intrusion made the seizure a *de facto* arrest before the consent was given, as Zukas argues was the case. We hold, however, that, based upon the totality of the circumstances, the level of intrusion prior to the consent search was no more than was necessary to dispel the officers' legitimate suspicions. Although the officers parked on the tarmac in front of the plane, their actions did not impede or interfere with Zukas's preflight preparations. The officers did not require the suspects to move to a new locale in order to conduct their investigation. We concede Zukas's argument that it is clear from the facts and from Nestoroff's testimony that Nestoroff would have been most reluctant to let the plane fly away; however, his subjective intent is not important in determining whether an arrest was made and he made no statements during the investigation to indicate to Zukas that he would impede or prevent Zukas and his passenger from departing the area if they had been prepared to do so. The presence of the two officers and their car must be considered inhibiting to some extent, but this was mitigated by the officers' casual approach, the fact that they displayed no weapons, wore plain clothes, were in an unmarked car, and advised the passenger that he was not under arrest. Considering all these factors and the level of legitimate suspicion, the government's interest justified the limited intrusion made upon the individuals' right of movement. We hold, therefore, that given the totality of the circumstances, the level of intrusion was justified by the officers' legitimate and reasonable suspicion. The district court did not err when it denied Zukas's suppression motion.

For the foregoing reasons, the judgment of conviction is

AFFIRMED.