UNITED STATES of America,
Plaintiff-Appellee,

v.

Patsy Marie GALBERTH,
Defendant-Appellant.

No. 87–1827
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

May 26, 1988.

Michael L. Ware, Ft. Worth, Tex. (court-appointed), for defendant-appellant.

Jimmy L. Tallant, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Ft. Worth, Tex., for plaintiff-appellee.

Before GEE, RUBIN, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Patsy Marie Galberth entered a conditional guilty plea to possession with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and was sentenced to ten years' imprisonment and a three-year special parole term. She asserts on appeal that the warrantless search of her person violated her constitutional rights, in that her acquiescence was not valid voluntary consent and even if it were, her consent was tainted by her improper detention and interrogation. We AFFIRM with reference to our recent *en banc* opinion in *United States v. Bengivenga*, 845 F.2d 593 (5th Cir.1988) (en banc) and the compatible prior panel decision in *United States v. Gonzales*, 842 F.2d 748 (5th Cir.1988).

## I. FACTS.

On the morning of June 26, 1987, Drug Enforcement Administration (DEA) officers at the Dallas/Fort Worth International Airport were watching passengers disembarking from American Airlines Flight 6 arriving from Miami, Florida, when they observed an "extremely nervous" male passenger deplane. This passenger kept looking back toward the jetway as if he were waiting for someone. The Appellant, Patsy Marie Galberth, got off the same flight shortly after he did. DEA Officer Kirk Griffith observed Galberth and the male passenger appear to look at one another, and then observed Galberth walk about 20 to 30 feet behind the male passenger down the concourse toward another airline's ticket counter. The male passenger continually kept turning and looking at Galberth as they were walking down the concourse. She appeared to be nervous, and kept looking ahead at the male, but remained approximately 20 to 30 feet behind him as they walked from Gate 30 to Gate 36E. Galberth walked to the unsecured area of

the terminal, and then to the American Eagle section of the terminal.

As another DEA officer approached the male passenger, Officer Griffith approached Galberth, identified himself as a narcotics officer, and asked if he might speak with her. Galberth was "startled and rather nervous," but she voiced no objection. Officer Griffith asked to see Galberth's airline ticket, which she took from her purse and handed to him. It was a one-way cash fare from Miami, Florida, to Lawton, Oklahoma, via Dallas/Fort Worth International Airport, issued that day in the name of "Betty Davis." Officer Griffith returned Galberth's airline ticket and asked to see some identification. Galberth produced a hospital card with her real name on it. Officer Griffith noticed that the defendant's hands were shaking, and her voice was quivering during their conversation.

When questioned about the difference in the names on the ticket and the hospital card, Galberth stated that her maiden name was Davis. When he asked her why the two first names were different, she replied that her sister-in-law in Miami had purchased the ticket for her. Officer Griffith then returned the hospital card, and upon questioning, Galberth stated that she had been in Miami for twenty-four hours and had visited her sister-in-law and other friends.

Officer Griffith again identified himself as a narcotics agent and then asked to look in Galberth's purse and carry-on bag. Again, she consented. As Officer Griffith examined Galberth's purse and carry-on bag, another officer came and stood about ten feet away.

As Officer Griffith examined the contents of the purse and bag and engaged Galberth in conversation, he observed a bulge on her lower abdomen under her clothing, that did not appear to be a part of her body. When asked if she was carrying anything under her clothing, Galberth "became visibly more nervous" and appeared "scared"; she was shaking, the artery in her neck began to throb, and her voice was quivering, but she replied that she was not carrying anything under her clothes. Officer Griffith asked Galberth to press her hands against her abdomen in three different places, and on the third request Officer Griffith testified he could clearly see that the bulge was not part of her body.

Officer Griffith next asked Galberth if she would mind if a female officer patted her down for possible narcotics. She responded affirmatively by saying only "Okay." Officer Griffith had the other officer who was nearby contact a female customs inspector to perform the search. From the time Officer Griffith first approached Galberth until the time she consented to be searched, approximately five minutes had elapsed. Officer Griffith and Galberth then waited an additional ten minutes in a lounge area of the airport for the customs inspector to arrive. She changed her shoes, and they engaged in "small talk," during which Galberth appeared to become more calm. At no time did she act as if she wished to withdraw her consent, although she had approximately ten minutes to reconsider her decision to cooperate.

When customs inspector Vicky Lovell arrived, she took Galberth into the women's public restroom. Inspector Lovell had Galberth place her hands on the side of the first available stall, and she conducted a pat-down. She felt a bulge in the midriff section and asked Galberth if it was part of her body. Galberth said it was not, and Inspector Lovell then removed a small package from between Galberth's pantyhose and underwear.

While she now says she voiced resistance to having her dress pulled up or otherwise being searched under her clothing, at no time did Galberth ask to leave the restroom or withdraw consent to the pat-down. At no time was Galberth asked to remove items of clothing, and Inspector Lovell did not directly touch her body except through her outer garments. Inspector Lovell thereafter gave the package to Officer Griffith, who inspected the pound-and-a-quarter bundle and its contents and identified the powder apparently to be cocaine. Galberth was placed under arrest and ad-

vised then of her *Miranda* rights. All of her incriminating oral statements were made after the contraband was discovered and she had been formally arrested and *Mirand* ized.[1]

Galberth was indicted for possession with intent to distribute 447 grams of 91%-strength cocaine. The district court denied Galberth's motion to suppress the evidence of the warrantless search of her person, whereupon Galberth entered a conditional plea of guilty pursuant to Fed.R.Crim.P. 11(a)(2). She was sentenced to ten years' imprisonment plus a three-year special parole term and a $50.00 special mandatory assessment.

The facts of this case present the issue of whether the warrantless search of Galberth's person violated her constitutional right to be free from unreasonable searches and seizures. Galberth argues that she did not voluntarily consent to the warrantless pat-down of her body, and that even if she had voluntarily consented, such consent was tainted by her previous illegal seizure. We agree with the district court

that the government proved that Galberth voluntarily consented to both the initial questioning by Officer Griffith and the ultimate search of her person by Inspector Lovell. Finding the remaining issues disposed of by the closely analogous recent decisions in *United States v. Bengivenga* (non-custodial interrogation) and *United States v. Gonzales* (asking an airline passenger for her ticket), the conviction and sentence are AFFIRMED.

## II. THERE WAS VALID CONSENT.

█ The district court denied Galberth's motion to suppress because of her consent to being searched. Such a finding of consent will not be overturned unless clearly erroneous.[2] In view of the totality of the circumstances, the district court's finding of a valid consent is not clearly erroneous.

The initial question is whether the government has proven that Galberth's consent to the search of her person was voluntary. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20

---

1. Absent "other fully effective means," *Miranda* warnings must be administered prior to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The *Miranda* Court first defined custodial interrogation to "mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612. The meaning of custody has been refined so that "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam)); *see also Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); *Minnesota v. Murphy*, 465 U.S. 420, 430–31, 104 S.Ct. 1136, 1143–44, 79 L.Ed.2d 409 (1984). The Supreme Court has also explained that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151.

In our recent *en banc* opinion in *United States v. Bengivenga*, 845 F.2d 593 (5th Cir.1988) (en banc), we summarized the "in custody" law as follows:

A suspect is therefore 'in custody' for *Miranda* purposes when placed under formal

arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances.

845 F.2d at 596.

2. *United States v. Chenault*, 844 F.2d 1124, 1128–29 (5th Cir.1988); *United States v. Hanson*, 801 F.2d 757, 760 n. 3 (5th Cir.1986); *United States v. Davis*, 749 F.2d 292, 294 (5th Cir.1985), *cert. denied*, — U.S. —, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986); *United States v. Phillips*, 664 F.2d 971, 1023 (5th Cir. Unit B. Dec. 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). In *United States v. Gonzales*, the "factually close determination" of consent was affirmed despite apparent appellate dissatisfaction with some of the bases for that finding.

While a de novo review might support a different result, applying the deferential 'clearly erroneous' standard, the scales tip in the balance of a conclusion by this Court affirming the district court's order finding Gonzales' consent voluntary.

842 F.2d at 755.

L.Ed.2d 382 (1968); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Davis*, 749 F.2d at 294; *United States v. Parker*, 722 F.2d 179, 182 (5th Cir.1983). The Supreme Court has said:

> [T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.

*Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047–48.[3]

This court has outlined six primary factors for consideration in determining whether consent to a search is knowing and voluntary: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir.1983). "Cognizant at all times of the fact that acquiescence cannot substitute for free consent," *United States v. Gonzales*, 842 F.2d at 754 we have concluded that, although all of the above factors are highly relevant, no one of the six factors is dispositive or controlling of the voluntariness issue. *Id.; Ruigomez*, 702 F.2d at 65; *United States v. Phillips*, 664 F.2d 971, 1023–24 (5th Cir.1981).

■ These factors show nothing but a voluntary consent to the search here. All the questioning occurred in a public area of the airport and lasted only five minutes. There is no indication that Officer Griffith's requests were made in an intimidating manner. When he asked Galberth whether she would mind if a female officer patted her down for possible narcotics, she replied "okay." Following her consent to the pat-down, Galberth and Officer Griffith waited in a public lounge area for approximately ten minutes and made "small talk." In fact, Galberth herself testified that Officer Griffith did not threaten her in any form or fashion,[4] and that he was nice to her. At no time did Galberth change her mind and withdraw her consent, though she was not specifically advised that she could.

Other facts that weigh in favor of the district court's finding of a valid consent to the search are Galberth's age, education, and prior experience with the criminal justice system. *United States v. Mendenhall*, 446 U.S. 544, 555–57, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980). In contrast to *Gonzales*, 842 F.2d at 755, where the "young" suspect was a 5'4" tall Hispanic with only a sixth-grade education and whose native tongue was not English, Galberth was thirty-eight years old at the time of this incident, had no difficulty with English, and had an eleventh-grade education. She had a prior criminal record for larceny and also for shooting her husband, and had been advised of her *Miranda* rights on both of these occasions. Galberth had been convicted of grand larceny and sentenced to a term of imprisonment in early 1987, and was still under house arrest in

---

3. *See Chenault*, 844 F.2d at 1129–30("Whether a defendant is coerced by the belligerence of an officer is a credibility determination to be made by the trial judge.") (citing *United States v. Williams*, 616 F.2d 759, 761 (5th Cir.1980)); *United States v. Cherry*, 759 F.2d 1196, 1205 (5th Cir.1985), *cert. denied*, — U.S. —, 107 S.Ct. 932, 93 L.Ed.2d 983 (1986); *United States v. Barfield*, 507 F.2d 53, 56–57 (5th Cir.1975).

4. *United States v. Mendenhall*, 446 U.S. 544, 554–57, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980), established certain factors, some elaborated upon more fully below, to determine whether there has been coercion of consent. With respect to threatening behavior on the part of law enforcement personnel, it is important to note here that Galberth herself testified (and does not retract now) that Officer Griffith did not use language or a tone of voice indicating that compliance with his request might be compelled. There were no statements or acts of the officer to convey to Galberth that she was not free to refuse the search or to walk away from the officer and proceed on her journey. There was no physical touching of her person by the officer; nor did he wear a uniform or display a weapon or otherwise make threatening gestures. *See Chenault*, 844 F.2d at 1128–29; *Gonzales*, 842 F.2d at 752–53.

Oklahoma at the time that she travelled to Miami and Dallas.

The district court's finding of a valid consent to be searched is not outweighed by the fact that Galberth was never told that she had the right to withhold her consent, or the facts that she was very nervous and obviously acted against her own self-interest. While knowledge of the right to refuse consent is one factor in determining voluntariness,[5] the failure to advise an individual of the right to withhold consent is not determinative in and of itself, and any weight accorded to such a failure is offset by Galberth's prior experience with her constitutional rights in a criminal setting.[6] Galberth's nervousness, likewise, does not preclude a finding of voluntariness in the light of all the other facts and circumstances involved in this case.

As in *Gonzales*, 842 F.2d at 755 where the suspect certainly was aware that incriminating evidence would be disclosed by a search of her carry-on bag, the fact that Galberth acted against her own self-interest by consenting to the request of the officer to produce her airline tickets and identification and subsequently consenting to the search of her person is immaterial to the issue presented in her motion to suppress the fruits of the search. *Id.* at 755 n. 3; *Bengivenga*, 845 F.2d at 600–01. The Supreme Court rejected that argument in *Mendenhall*, 446 U.S. at 555–56, 100 S.Ct. at 1878, stating:

> It may happen that a person makes statements to law enforcement officials that he later regrets, but the issue in such cases is not whether the statement is self-protective, but rather whether it was made voluntarily.

*See Berry*, 670 F.2d at 598 n. 16. As this court recently said,

> In the purest sense, consent by suspects with knowledge that incriminating evidence will be discovered during a search would never be truly voluntary if self-interest were the primary focus of the voluntariness inquiry.

*Gonzales*, 842 F.2d at 755 n. 3.

Based upon all the facts and circumstances of this case, Galberth's consent to the search of her person was voluntary. The district court's finding of a valid consent is not clearly erroneous.

## III. PROPRIETY OF GALBERTH'S DETENTION AND SEIZURE.

Even before reaching the issue of whether Galberth voluntarily consented to the search, we must determine whether such consent was tainted by an illegal seizure. We recognize, in other words, that the taint of an unconstitutional seizure cannot be removed by the defendant's subsequent consent except where there are substantial intervening factors. *See Berry*, 670 F.2d at 605. So we must identify the point at which the stop of Galberth became a seizure.

First, not all police-citizen contact invokes the fourth amendment, *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968), though the courts "should closely scrutinize whether [the totality of] those circumstances reveal[s] the presence of coercion." *Berry*, 670 F.2d at 596–97. Instead, there are three levels of police-citizen encounters:

> [(1)] communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, [(2) so-called *Terry* stops or] brief 'seizures' that must be supported by reasonable suspicion, and [(3)] full-scale arrests that must be supported by probable cause.

*Id.* at 591. *See Hanson*, 801 F.2d at 761.

At the first level, there is no element of detention or coercion, and the fourth

---

**5.** However, proof of knowledge of the right to refuse consent is not required to show voluntariness, *Davis*, 749 F.2d at 296, *Mendenhall*, 446 U.S. at 555, 100 S.Ct. at 1877, because consent to a search is not the same as a waiver of a trial right and, therefore, need not be knowing and intelligent. *Schneckloth*, 412 U.S. at 241, 93 S.Ct. at 2055.

**6.** *Mendenhall*, 446 U.S. at 557, 100 S.Ct. at 1878. *See Schneckloth*, 412 U.S. at 231–32, 93 S.Ct. at 2049–50; *Gonzales*, 842 F.2d at 754–55; *United States v. Berry*, 670 F.2d 583, 598 n. 14 (5th Cir.1982) (en banc); *United States v. Ehlebracht*, 693 F.2d 333, 338 (5th Cir.1982) (later refusal of further cooperation shows awareness that prior consent could have been withheld); *Davis*, 749 F.2d at 294, 296.

amendment is not implicated.[7] The second level involves brief detentions or investigatory stops and requires "reasonable suspicion" on the part of the detaining officer, based upon "specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant an intrusion."[8] The third level, arrest, obviously requires the existence of probable cause.[9]

■ The facts establish that Officer Griffith initially approached Galberth and made inquiries that constituted the mere communication level of contact. *Hanson,* 801 F.2d at 761. No coercion was shown by the officer's words or conduct, nor did he intimate that an innocent individual would certainly cooperate with police. In addition, prior to the search request, the officer's inquiries established that Galberth was attempting to hide her true identity by lying to the officers about her name. This action, coupled with her obvious anxiousness and the additional facts observed by the officers up to that point, constituted articulable facts that would reasonably warrant further inquiry by the officers. *United States v. Ehlebracht,* 693 F.2d 333, 336–38 (5th Cir.1982). Furthermore, she was returning from a known source city for illegal narcotics, her airline ticket was a cash one-way ticket from Florida to Oklahoma, and she admitted to having been in Miami for only twenty-four hours. *Gonzales,* 842 F.2d at 752–53; *United States v. Elmore,* 595 F.2d 1036, 1039 (5th Cir.1979), cert. denied, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).

Officer Griffith's asking Galberth whether he could speak with her, and her subsequent consent, fall within the first level of police-citizen contact. The stop was extremely restricted in scope and was conducted in a completely non-coercive manner. After requesting to see Galberth's ticket and identification, Officer Griffith immediately returned them to her. Galberth was free to leave at any time, and in view of all the circumstances surrounding the incident, a reasonable person would have believed that she was free to leave at any time. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877; *Bengivenga,* 845 F.2d at 596; *Chenault,* 844 F.2d at 1128–29; *Zukas,* 843 F.2d at 183; *Gonzales,* 842 F.2d at 751–52; *Berry,* 670 F.2d at 594–95; *Elmore,* 595 F.2d at 1042.

7. *Berry,* 670 F.2d at 595, 603; *see Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983) (noting that mere approach by law enforcement agents, identifying themselves as officers, does not constitute a seizure); *see also Michigan v. Chesternut,* — U.S. —, —, 108 S.Ct. 1975, 1981, 100 L.Ed.2d 565 (1988) ("Without more, the police conduct here—a brief acceleration to catch up with (pedestrian) respondent, followed by a short drive alongside him—was not 'so intimidating' that respondent could reasonably have believed that he was not free to disregard the police presence.").

8. *Terry v. Ohio,* 392 U.S. at 19, 88 S.Ct. at 1878–79; *United States v. Martinez-Fuerte,* 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976) ("some quantum of individualized suspicion"); *United States v. Zukas,* 843 F.2d 179, 182–83 (5th Cir. 1988) ("[While] several of these factors have no independent significance except that they fit the DEA's drug-smuggler profile [and] no single factor would support a reasonable, particularized suspicion[, ...] considered together with Zukas's prior record, the specific activities observed ... render[ ] the whole greater than the sum of its parts."); *Gonzales,* 842 F.2d at 753 n. 2 ("[D]rug courier profile characteristics are often useful in focusing the attention of a law enforcement official on a particular individual and may be relied upon, in conjunction with other individualized factors, to support a finding of reasonable suspicion."); *Berry,* 670 F.2d at 600. In *Michigan v. Chesternut,* the Court reversed a state court holding 1) that the Fourth Amendment prohibited any "investigatory pursuit" without the articulable facts required under *Terry,* and 2) that a defendant's flight from police would, alone, justify only a brief initial stop, and 3) would not, of itself, be enough to hold the person any longer. The unanimous Court held that suppression of evidence discarded by the suspect was unnecessary, because no Fourth Amendment seizure had taken place. Expressing no view on whether police pursuit with sirens blaring, or other indication that the citizen must stop, would constitute a seizure requiring some particularized and objective basis under *Terry,* the Court emphasized that "the goal of the 'chase' was not to capture [the] respondent, but 'to see where he was going.'" *Id.,* — U.S. at — nn. 7, 9, 108 S.Ct. at 1980 nn. 7, 9, 100 L.Ed.2d 565.

9. *Zukas,* 843 F.2d at 182.

In *Elmore*, this court held that a simple stop had occurred when a DEA agent approached Elmore, identified himself, and asked to see Elmore's ticket. The court further found that the stop became a seizure when the agent removed Elmore's ticket from the immediate vicinity, but that such seizure was lawful because the inconsistencies between Elmore's identification and story and the name on the ticket provided the reasonable suspicion necessary for seizure. *Id.* at 1039–40.[10]

Although the officer's request for Galberth to allow him to examine her purse and bag for narcotics may be argued to have elevated the discussion to a *"Terry-type"* detention, *Gonzales*, 842 F.2d at 752–53,[11] she voluntarily consented to the examination. The interview was conducted in a public area of the airport terminal, not (as in *Bengivenga* and *Chenault*) in one of the private offices. There was no coercion or trickery on the part of the officer, and the interview was not prolonged or repetitious. The officer did nothing to lead her to believe that she had to consent to the search or that she was not free to leave. However, by the time of the search of her person, the officer had developed ample probable cause for further inquiry and a body search, even if Galberth had refused consent. *Zukas*, 843 F.2d at 182–83; *Ehlebracht*, 693 F.2d at 338; *Elmore*, 595 F.2d at 1040.

Galberth testified at trial that from the moment Griffith confronted her with the fact that he was a narcotics officer, she felt that she had to do everything he "requested" or that she would go to jail. However *Michigan v. Chesternut,* —— U.S. ——, ——, 108 S.Ct. 1975, 1980, 100 L.Ed.2d 565, acknowledges a "reasonable person" standard. "Fourth Amendment protection does not vary with the state of mind of the particular individual being approached."; *Accord Bengivenga*, 845 F.2d at 597 ("[T]he subjective belief of the subject [is] irrelevant to the custody determination."). Her knowledge (or her ignorance) that the other two men with Griffith were also law enforcement officers is similarly irrelevant beyond her presently-argued subjective apprehension that they were not going to let her go. During the pat-down in the women's restroom, the female customs inspector stood between Galberth and the single exit, but did not physically prevent her leaving. Galberth now says she told Inspector Lovell that she did not want to be searched under her dress; nonetheless, there is no evidence of compulsion except current complaints that the female officer told her that "she [the officer] had to" search her dress and stockings and that in order to do that she had to pull the dress up. Galberth testified that Lovell never ordered her to do anything nor threatened her with arrest if she did not continue to cooperate.[12]

10. *See Zukas*, 843 F.2d at 182 n. 1 (ordinary "ramp check" of a private plane suspected of carrying narcotics became a (similarly limited) *Terry*-stop only when the pilot's documents and license had been verified and yet they were retained based upon reasonable suspicion); *Gonzales*, 842 F.2d at 753 ("[W]e find particularly significant the fact that Gonzales deliberately sought to deceive the officers as to the true duration of her stay in the area."); *Hanson*, 801 F.2d at 763; *Berry*, 670 F.2d at 603–04.

11. If reasonable suspicion based upon articulable facts were not required under *Terry* at this stage, it certainly would be required once Officer Griffith stated that he wanted the female agent to pat her down for "possible narcotics," because "a statement by a law enforcement officer that an individual is suspected of illegal activity is persuasive evidence that the fourth amendment has been implicated." *Gonzales*, 842 F.2d at 752, *passim* (citing *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229

(1983), and other cases, the panel emphasized the officer's statement that he was "working narcotics" when he asked to search her gym bag); *Hanson*, 801 F.2d at 761 ("In any event, we find that, for fourth amendment purposes, a seizure occurred at the point Pinkston took Hanson aside and informed him that he was suspected of carrying narcotics."); *United States v. Glass*, 741 F.2d 83, 87 (5th Cir.1984).

12. The hearing testimony shows that Galberth's claimed objection to being searched under her clothing is a concern raised only for purposes of this appeal. After exploring the circumstances of her consent to Officer Griffith concerning calling a female officer to do a body search, the prosecutor's cross-examination of Galberth asked about Inspector Lovell's instructions and commands to her upon entering the restroom and whether the customs agent coerced or threatened her; the Assistant United States Attorney asked whether Lovell told her she had to

Whether a suspect has actually been "seized" for purposes of the fourth amendment is determined by viewing "all circumstances surrounding the incident," and determining whether "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. *See Michigan v. Chesternut*, — U.S. at —, 108 S.Ct. at 1979, 1980, 100 L.Ed.2d 565, ("[W]e adhere to our traditional contextual approach ..., [an] objective standard looking to the reasonable man's interpretation of the conduct in question."); *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1948) ("[Viewing] all the circumstances surrounding the incident."). In the foot-

note following that comment, however, the *Mendenhall* Court stated that in determining whether an individual has actually been "seized" within the meaning of the fourth amendment, the subjective intent of the DEA agent to detain or, assumedly, *not* to detain, "is irrelevant except insofar as that [intention] may have been conveyed to the respondent." [13] *Id.* at 554 n. 6, 100 S.Ct. at 1877 n. 6.

Subjective intention to hold, with or without a belief that proper probable cause exists, was one of the four factors applied by this court before *Bengivenga* to determine whether an interrogation occurred in a custodial context.[14] Since *Bengivenga*'s

do anything or continue with the search, and Galberth responded:

A. No, but I did tell her that I didn't want her searching under my dress and she told me that she had to.
Q. She'd already found the little package there on your stomach in the pat-down when she told you she would have to search under your dress?
A. No, sir, she was still searching me down....
Q. Well she didn't pull the dress up before she felt the bulge, she patted you down first, right?
A. Yes, down over my backside, down over my legs, up under my dress. That's the way she pat-searched me.

The defense attorney curiously made no cross-examination of Inspector Lovell about the timing of the purported objection to searching under the dress (before or after feeling the bulge) or even whether her memory could be faulty on whether Galberth made such an objection. Indeed, he never questioned her statement that Galberth's only words to her were about her current house arrest, though he extensively examined Inspector Lovell about who was standing closest to the exit; whether she found anything else ("no weapons, no currency?"); whether she told Galberth that "she didn't have to consent to this" or gave her any instructions other than to place her hands on the stall; and whether she asked her any questions ("whether or not she knew she didn't have to consent to this?").

**13.** Galberth asserts a significant distinction from *Mendenhall,* 446 U.S. at 558, 100 S.Ct. at 1879, where the court emphasized that "it is especially significant that the respondent was twice expressly told that she was free to decline to consent to the search, and only thereafter explicitly consented to it"; but she nonetheless wishes to rely on *Mendenhall's*

Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave[; some of which] would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* at 553–54, 100 S.Ct. at 1877.

In recognizing her failure to retract her consent, seek to leave, or otherwise deny Officer Griffith her full cooperation, Galberth now would characterize Griffith's behavior towards her as much harsher and more intimidating than she did at her hearing. *See* Part II, *supra.* But she is bound now by her description of events then, and so cannot manipulate the facts of her "confrontation" with the DEA agents any more than she can now mischaracterize Inspector Lovell's ordinary pat-down of her as a "strip search." *See infra* n. 16.

**14.** *Compare United States v. Morin,* 665 F.2d 765, 769–70 (5th Cir.1982); *United States v. Warren,* 578 F.2d 1058, 1071 (5th Cir.1978); *United States v. Nash,* 563 F.2d 1166, 1168 (5th Cir. 1977); *United States v. Carollo,* 507 F.2d 50, 52 (5th Cir.1975), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105 (1976); *with Michigan v. Chesternut,.* — U.S. at — n. 7, 108 S.Ct. at 1980 n.7, 100 L.Ed.2d 565, ("Of course, the subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted."); *with Berkemer,* 468 U.S. at 442, 104 S.Ct. at 3151 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody.' "); *Murphy,* 465 U.S. at 431, 104 S.Ct. at 1144 (the intent of a case officer who questions a probationer is immaterial to the custody issue); *Bengivenga,* 845 F.2d at 597 ("[T]he unrevealed subjective intent of the law enforce-

abolition of the four-factor test for custody, we must place more emphasis on footnote 6 of *Mendenhall.* *See Chesternut,* —— U.S. at —— n. 7, 108 S.Ct. at 1980 n. 7, 100 L.Ed.2d 565. For example, recognizing that the officer's car was parked immediately in front of the suspect's plane and that the officer had not returned the pilot's documents, the panel in *Zukas* readily conceded that

> [I]t is clear from the facts … [that the DEA agent] would have been most reluctant to let the plane fly away; however, his subjective intent is not important in determining whether an arrest was made and he made no statements during the investigation to indicate to Zukas that he would impede or prevent Zukas and his passenger from departing the area if they had been prepared to do so.

843 F.2d at 183. *See Immigration & Naturalization Serv. v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762–63, 80 L.Ed. 2d 247 (1984) (a reasonable person would not expect detention, if he declined to answer questions or otherwise cooperate, just because immigration officials positioned agents by the door of a building, while other agents circulated through the plant asking employees about their citizenship).

The initial circumstances here are somewhat similar to those found in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).[15] There, the Court found that what had begun as a consensual inquiry in a public place had escalated into a full-scale arrest when the subject was asked to accompany law enforcement officers "to a room approximately 40 feet away, adjacent to the concourse." *Id.* at 494, 103 S.Ct. at 1322. The subject was seen to have affirmatively "consented" to the warrantless search of his luggage that revealed contraband,[16] but the Court held that since the subject was, in effect, under arrest on less than probable cause at the time he consented to the search in the "small enclosed area being confronted by two police officers," the consent was tainted and incapable of validating an otherwise illegal search. *Id.* at 501, 103 S.Ct. at 1326. Thus, *Royer* differs from the instant case in that the consent was given in a secluded room, and Royer's luggage and ticket had been *confiscated* without probable cause.

■ It is true that Officer Griffith candidly admitted that, at the time Galberth was taken into the bathroom and searched, even if they could properly detain her, he and the other agents did not have a legally

---

ment officer and the subjective belief of the subject [ ] are irrelevant to the custody determination.").

**15.** There are also numerous distinctions between the fully consensual search here and *Royer*'s segregated non-consensual interrogation, where an arrest was seen to have occurred on less than probable cause. The two officers took Royer's ticket and identification, which they did not return to him, and they took him to a private office to obtain his consent for a search of his checked luggage. The officers had retrieved his baggage from the airline and presented Royer with the "request" to open them while in that private office. A finding of confinement sufficient to justify safeguards against custodial interrogation thus was in no way dependent upon his subjective impressions of the situation. *Cf. Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) ("[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in

a 'coercive environment.'"). Objective evaluation of the circumstances of his treatment by a neutral observer, *Bengivenga,* 845 F.2d at 596, would indicate that a reasonable person would have understood that Royer was not free to go and therefore had a right to *Miranda* warnings. *Cf. Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762–63.

**16.** Characterizing the pat-down as a strip search because Inspector Lovell reached under Galberth's dress to remove the bundle she had already detected, Galberth argues that she suffered a greater intrusion into her privacy than what was condemned in *Royer,* where the agents merely looked into some luggage. This court in *Berry,* 670 F.2d at 597, did say that "The more intrusive on an individual's freedom complying with a request would be, the greater should be the skepticism with which a court treats assertions that an individual consented to a request"; but this does not determine when consent was given, however, or suggest less validity to an acquiescence voluntarily and intelligently extended. *See Mendenhall,* 446 U.S. at 555–56, 100 S.Ct. at 1877–78; *Gonzales,* 842 F.2d at 754–55.

sufficient probable cause to arrest her.[17] However, the existence of probable cause to arrest is largely immaterial to the question of custody.[18] If a custodial investigation had been taking place, Galberth's *Miranda* rights would have been implicated, but even *Royer* indicates Galberth suffered no *constitutional* assault; the Court in *Royer* stated that had the suspect consented to a search on the spot (in the public area of the terminal rather than in the segregated, enclosed office), the search could have been conducted with him present (in the baggage claim area where the luggage was retrieved by the officer),

and any evidence recovered would have been admissible against him—despite the *Miranda* violation. 460 U.S. at 505, 103 S.Ct. at 1328.

*Bengivenga* does not cite *Royer*, but parallels its reference to consensuality and segregation throughout the majority opinion. When a suspect validly consents to interrogation or physical investigation, there may in some cases be a seizure for fourth amendment purposes, requiring probable cause, but there is not necessarily the custodial relationship that implicates *Miranda* rights. *Gonzales*, 842 F.2d at 752.[19]

---

**17.** *Zukas*, 843 F.2d at 183 ("The suspicion did not rise to the level of probable cause [for arrest], though, until after Zukas and the passenger had consented to a search that resulted in the discovery of cocaine.").

**18.** *Berkemer v. McCarty*, 468 U.S. 420, 435 n. 22, 104 S.Ct. 3138, 3148 n. 22, 82 L.Ed.2d 317 (1984) (holding that traffic stops do not ordinarily place a motorist in custody, the court rejected the position that custody arises as soon as the level of suspicion amounts to probable cause to arrest); *Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966) (police officers are not required to effectuate an arrest the moment probable cause arises because "officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall short of the amount necessary to support a criminal conviction"); *Bengivenga*, 845 F.2d at 596–97 ("Regardless of the presence of probable cause, until an officer acts to exert some type of restraint a suspect cannot reasonably believe her freedom is restrained.") (citing undercover investigations where the presence of probable cause and focus provide no basis to infer coercion; *see, e.g., United States v. Marks*, 603 F.2d 582, 584 (5th Cir.1979) (per curiam)); *Zukas*, 843 F.2d at 182–83.

**19.** This court has noted that "the core meaning both of 'seizure' in the fourth amendment sense, and of 'custody' in the *Miranda* sense, appears to be the same: the restraint of a person's 'freedom to walk away' from the police." *United States v. Brunson*, 549 F.2d 348, 357 n. 2 (5th Cir.), *cert. denied*, 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107 (1983). Since a fourth amendment seizure does not necessarily render a person "in custody" for purposes of *Miranda* (*Gonzales*, 842 F.2d at 755), however, *Bengivenga*, 845 F.2d at 598, saw the "critical difference" between seizure and custody to be that custody arises only if the restraint on freedom reaches a certain degree—"the degree associated with formal ar-

rest." *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877; *See also INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). Traffic stops, consequently, constitute a fourth amendment seizure, but do not automatically place a person in custody for purposes of *Miranda*. *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150; *see Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *Zukas*, 843 F.2d 182; *Gonzales*, 842 F.2d at 755. The degree of restraint associated with arrest is more enduring and less circumspect. *Bengivenga*, 845 F.2d at 598; *Zukas*, 843 F.2d at 182; *Hanson*, 801 F.2d at 757.

"Stationhouse interrogation" frequently may be prolonged, and a reasonable person might expect questioning to continue until "he provides his interrogators the answers they seek." *Berkemer*, 468 U.S. at 437, 104 S.Ct. at 3148 ("[T]raffic stop[s are] presumptively temporary."). The public nature of traffic stops and airport detentions reduces the hazard that police might resort to overbearing means to elicit incriminating responses and diminishes the motorists' or airline passengers' fear of abuse by the police if they fail to cooperate. *Id.* at 439, 104 S.Ct. at 3150 (presence of passersby guards against actual police misbehavior and undercuts the police-dominated environment). "That no more than one or two police officers usually participate in a traffic stop also mitigates a motorist's sense of vulnerability." *Bengivenga*, 845 F.2d at 598 (discussing *Berkemer* elements found in the "brief detention ..., limited questioning and possibl[e] production of a relevant document" of a routine checkpoint stop).

As with *Berkemer*'s established roadway checkpoints and *Bengivenga*'s border crossing stations, routine airport inquiries and "seizures" for potential drug smuggling are "reassuring to law-abiding [travellers] that the stops are duly authorized and believed to serve the public interest." *Mendenhall*, 446 U.S. at 559–60, 100 S.Ct. at 1880; *Gonzales*, 842 F.2d at 751–52. Like a traffic stop or routine citizenship check, airport detention is by its nature brief and sub-

Consequently, even if the stop of Galberth transformed itself into a "seizure" for fourth amendment purposes, the "seizure" was supported by the requisite reasonable suspicion. *Id.* As in *Elmore* and *Gonzales,* there were inconsistencies between Galberth's identification on her ticket and her hospital card. Galberth's story that attempted to explain these inconsistencies was less than believable. Accordingly, Officer Griffith had the reasonable suspicion necessary to justify Galberth's seizure.

▮ Such *Terry*-stops do not render a person in custody for purposes of *Miranda. Berkemer,* 468 U.S. at 439–40, 104 S.Ct. at 3150; *Royer,* 460 U.S. at 499, 103 S.Ct. at 1325; *Delaware v. Prouse,* 440 U.S. at 653, 99 S.Ct. at 1396; *Zukas,* 843 F.2d at 182; *Gonzales,* 842 F.2d at 755; *Elmore,* 595 F.2d at 1039. *See also Michigan v. Chesternut,* —— U.S. ——, 108 S.Ct. 1975, 100 L.Ed.2d 565.

As in *Berkemer,* 468 U.S. at 441–42, 104 S.Ct. at 3151, where an officer asked a motorist to step out of his car and to perform a sobriety test, simply asking passengers to step off a bus and inquiring about ownership of luggage does not render a suspect in custody.

*Bengivenga,* 845 F.2d at 599.

## IV. THE FRUIT OF THE POISONOUS TREE DOCTRINE.

▮ Assuming that she was indeed in custody for purposes of *Miranda,* Galberth, like the defendant in *Bengivenga,* argues that even the nontestimonial evidence of the cocaine package must be suppressed if it is tainted by a custodial interrogation that occurs in violation of *Miranda.* However,

> This contention is contrary to the rule that a mere violation of *Miranda*'s 'prophylactic' procedures does not trigger the fruit of the poisonous tree doctrine. The derivative evidence rule operates only when an actual constitutional violation occurs, as where a suspect confesses in response to coercion. None of the tactics employed by the agents were 'so offensive to a civilized system of justice that they must be condemned.' *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

*Bengivenga,* 845 F.2d at 601 (other citations omitted) (baggage claim stubs were non-testimonial and could not be excluded as fruit of the poisonous tree, because there was only a *Miranda* violation, not a constitutional violation).[20] Galberth has failed to forward specific instances of taint to shift the burden of persuasion onto the government that the cocaine package would not have been inevitably discovered or was otherwise untainted. *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Because of our finding (in contrast to *Royer*) that she had not been illegally arrested at the time of the body search, the derivative-evidence rule and inevitable-discovery exception provide alternative bases for finding the poisoned-fruit argument unpersuasive. *See United States v. Cherry,* 759 F.2d at 1207, 1209–10 & n. 20.

---

ject to the scrutiny of other travelers, so "[t]he objective intrusion of the stop and inquiry ... remains minimal" and limited in scope, *Mendenhall,* 446 U.S. at 559–60, 100 S.Ct. at 1880, and "advance notice obtains and visible signs of authority mitigate rather than enhance the perceived degree of restraint." *Bengivenga,* 845 F.2d at 599.

20. *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (reasoning of, and exception for, derivative evidence apply to violation not of the fifth amendment itself, but merely of *Miranda*'s "nonconstitutional prophylactic rule," regardless of whether the fruit is "a witness [*Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)] or an article of

evidence [or] the accused's own voluntary testimony"); *New York v. Quarles,* 467 U.S. 649, 663, 104 S.Ct. 2626, 2635, 81 L.Ed.2d 550 (1984) (plurality) (O'Conner, J., concurring) (failure to administer *Miranda* warnings violates only a nonconstitutional prophylactic rule, and so the gun there at issue and other nontestimonial incriminating evidence, such as fingerprints, food tests, and voice recordings, could be admissible); *United States v. Cherry,* 759 F.2d 1196, 1209–10 & n. 20 (5th Cir.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 932, 93 L.Ed.2d 983 (1986) (the Court's decision in *Oregon v. Elstad* supersedes prior holdings that derivative physical evidence obtained through an illegally-arrested suspect's consent would be tainted by prior *Miranda* violations).

## V. CONCLUSION.

Based upon the foregoing, Galberth voluntarily consented to the search of her person, and that consent was not tainted by any previous illegal seizure. Even if Galberth was placed "in custody" at the time of her body search, the evidence should not have been suppressed, because it was non-testimonial and the derivative evidence rule was not triggered by an actual constitutional violation. Accordingly, the district court did not err in denying Galberth's motion to suppress, and the judgment is

AFFIRMED.