**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————

No. 12-51063

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MATTHEW JOSEPH MASSI,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**
August 1, 2014

Lyle W. Cayce
Clerk

———————

Appeal from the United States District Court
for the Western District of Texas

———————

Before OWEN, SOUTHWICK, and GRAVES, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Matthew Joseph Massi was arrested and charged with possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841. He moved to suppress evidence uncovered during his detention by law enforcement officers. The district court denied the motion. Massi later entered a conditional plea agreement, preserving his right to appeal the district court's denial of his motion to suppress. We AFFIRM.

FACTUAL AND PROCEDURAL HISTORY

Sometime before 6:00 p.m. on May 16, 2012, Massi and Jose Sanchez, the pilot of a chartered Mooney M20J single-engine airplane, landed at

Midland International Airport in Midland, Texas en route from Las Vegas, Nevada to Orlando, Florida. At approximately the same time, the Air Marine Operations Center ("AMOC"), a center operating within United States Customs and Border Protection, set in motion an investigation of the airplane and its passengers. The explanation of why AMOC acted and what was done was proffered by Agent Josh Howard, the Government's witness at the suppression hearing. Agent Howard was a criminal investigator in the Midland office of the Homeland Security Investigations directorate, United States Immigration and Customs Enforcement, which is within the United States Department of Homeland Security. Agent Howard testified that AMOC, responsible for monitoring all air traffic in the United States, contacted the Midland Police Department ("MPD") at 6:00 p.m. to request a "ramp check" of Massi's airplane. A ramp check, as described by Agent Howard, is a regulatory inspection that can be ordered at any time under regulations of the Federal Aviation Agency. He described the reach of a ramp check this way:

> First and foremost, they will ask for consent to search the plane. They will ask for identities of all passengers and the pilot. And with AMOC's guidance, they will check FAA records. There should be an actual certificate displayed in the airplane.[1]

Agent Howard testified that AMOC informed the agents of three facts that triggered AMOC's request for a ramp check: the airplane had flown from Orlando to Las Vegas, making six refueling stops along the way, stayed in Las Vegas for about twelve hours, then was returning to Orlando with Midland as a refueling stop; the registered owner of the airplane had been convicted of

---

[1] This court once stated that a "ramp check, authorized by state and federal law, permits officers of the Federal Aviation Administration ("FAA") or police to examine the pilot's and aircraft's licensing and certification to ensure that they conform to FAA regulations." *United States v. Zukas*, 843 F.2d 179, 181 (5th Cir. 1988). Neither party has directed us to current authorizations, by regulation or otherwise, for ramp checks. Massi has not challenged the ramp check itself by way of refuting its authorization, scope, or potential duration.

drug trafficking approximately twenty years earlier; and the passenger, Massi, had "recently" crossed from Tijuana, Mexico into the United States, which at some point was shown to have occurred on May 13, 2012.

Agent Howard's testimony is a little unclear as to exactly what was communicated to him by AMOC and when it was communicated. After testifying that he was told the three facts, he was asked, "And when they first told you suspicious flight activity, did they elaborate on that at that amount [?], or did you have to get that information later?" Howard answered: "I need to clarify that. I don't recall if they told me exactly what was going on at the time, but I did – I did corroborate the information."

According to Agent Howard, three minutes after AMOC's 6:00 p.m. contact, MPD learned that the two men who had flown on the airplane had left to get food at a Subway sandwich location. When the men landed and then left for food is unclear. Two MPD officers, apparently stationed that evening at the airport, were the first to arrive at the aircraft. It is unclear whether Massi and Sanchez had yet returned. At 6:20 p.m., AMOC contacted the Homeland Security Investigations directorate. Agents Jerry Garnett and Kris Knight were dispatched to the airport. Those two agents thus began their investigatory work after 6:20 p.m. Agent Howard did not arrive until 7:30 p.m.

The MPD officers questioned Massi and Sanchez prior to the arrival of the Homeland Security agents. The officers requested documents and identification. Sanchez and Massi complied by retrieving documents from luggage from within the airplane. The luggage was placed on the airplane's wing and remained there for the duration of the investigation. Agents Knight and Garnett arrived after this initial questioning, briefly talked to the MPD officers, and then questioned Massi and Sanchez. They also made an exterior examination of the airplane. A canine unit was called at some point to conduct

a sniff of the airplane's exterior, including the luggage. The canine, Gus, did not alert. Massi and Sanchez were asked and each denied consent to search the interior of the airplane. Simultaneous with denying consent to search, Massi attempted quickly to shut the airplane's open door. An MPD officer stopped Massi from doing so and told Massi to stay away from the airplane.

During the inspection of the airplane's exterior that is authorized under a ramp check, Agent Knight saw a cardboard box through the window of the airplane. The box, which was described as measuring "18 to 24 inches across," was located behind the rear seat of the airplane. Agent Knight questioned Massi and Sanchez separately about the box. Sanchez said he had seen Massi put the box in the airplane. Massi, though, initially denied knowledge of the box. He first responded to Knight's question about who owned the box by saying, "I don't know what you are talking about." Asked again, Massi said "I don't know of any boxes." Then, having been told that Sanchez said he had put the box on the plane, Massi acknowledged that he owned the box and requested an attorney. At this request, Agent Knight stopped his questioning.

All the events just described occurred prior to Agent Howard's arrival at the airport, which was at approximately 7:30 p.m. For the next two hours, Agent Howard was on the scene "collecting facts about what had transpired" at the airport prior to his arrival. He did not question Massi or Sanchez, who were required to remain at the airplane. During this time, Agent Howard's office contacted an assistant United States Attorney to obtain guidance for the investigation. Approval was given to request a search warrant.

Agent Howard left the airport around 9:30 p.m. to return to his office, which was approximately twenty minutes from the airport by car. By 10:00 p.m., he began writing the affidavit to support a request for a search warrant. Agent Howard also corroborated information that was received

4

earlier from AMOC.  He emailed the affidavit to the United States Attorney's office and obtained its approval.  He then contacted a federal magistrate judge, drove to the magistrate judge's residence, and obtained the signed warrant at 11:30 p.m. Agent Howard returned to the airport with the search warrant at approximately midnight and conducted a search of the airplane.  Nineteen sealed bags of marijuana with a total weight of 10.50 kilograms were found within the cardboard box.  Upon this discovery, Massi and Sanchez were immediately arrested, informed of their rights, and taken into custody.

Massi was charged with possession with intent to distribute marijuana. He moved to suppress all evidence seized in the search of the airplane as a product of an illegal arrest and improperly prolonged detention.  The district court denied the motion. Massi pled guilty, conditioned on being allowed to appeal the validity of the order denying his motion to suppress.

## DISCUSSION

In considering a district court's decision on a motion to suppress, this court reviews findings of facts for clear error and conclusions of law *de novo*. *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998).  All record evidence is viewed "in the light most favorable to the party who prevailed in the district court." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993).  The district court's ruling should be upheld "if there is any reasonable view of the evidence to support it." *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc) (quotation marks omitted).

Massi argues that the district court erred in denying his motion to suppress because the search warrant relied upon by the officers was the product of an illegal seizure, namely, his lengthy detention at the airport.  He contends that his detention was without reasonable suspicion, lacked probable cause, and was of a length that violated the Fourth Amendment.  He further

argues that his unconstitutional detention taints evidence obtained as a result of the search warrant's execution and that such evidence should be excluded as fruit of the poisonous tree.

The Government argues that Massi's detention was appropriate under the Fourth Amendment because the initial regulatory check was valid. As the investigation progressed, reasonable suspicion and eventually probable cause to search arose. The Government denies there was ever an illegal arrest. Regardless, the Government argues that the good faith exception to the exclusionary rule would permit the admissibility of any evidence obtained pursuant to the search warrant because the warrant was obtained and executed by an officer acting with objective good faith under *United States v. Leon*, 468 U.S. 897 (1984).

*I. Legality of the Stop and Detention*

The district court denied Massi's motion to suppress. The court held that there was "initial reasonable suspicion to make the stop and that it developed into probable cause" justifying continuing the stop.

The Fourth Amendment guarantees individuals the right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Evidence that was obtained from a "substantial and deliberate" violation of the Fourth Amendment will be suppressed and excluded from consideration. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). This court has recognized that there are different "tiers of citizen-police contact for purposes of fourth amendment analysis." *United States v. Zukas*, 843 F.2d 179, 181 (1988) (citing *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. 1982)). The first tier involves "no coercion or detention and does not implicate the fourth amendment." *Zukas*, 843 F.2d at 181. The

No. 12-51063

second tier, an investigatory stop, "is a brief seizure that must be supported by reasonable suspicion . . . ." *Id.* Finally, the third tier is "a full scale arrest [which] must be supported by probable cause." *Id.* at 181-82.

For the purposes of our discussion of Massi's interaction with law enforcement, the following chronology is our best understanding of the events from evidence at the suppression hearing and in the affidavit supporting the search warrant:

(1)    Massi and Sanchez land the airplane at Midland Airport at or before 6:00 p.m., then leave to get food.

(2)    AMOC notifies MPD at 6:00 p.m. of the airplane's arrival and requests a ramp check.

(3)    MPD officers question Massi and Sanchez, doing so after the latter return in a rental car from picking up food.

(4)    Homeland Security Agents Knight and Garnett arrive after 6:20 p.m. and begin participating in the ongoing encounter initiated by MPD.

(5)    The questioning of Massi and Sanchez and the inspection of the airplane are completed by 7:30 p.m., with canine Gus's failure to alert occurring at approximately 7:20 p.m.

(6)    From 7:30 to 9:30 p.m., Massi and Sanchez's detention continues as Agent Howard arrives on the scene and gathers information from the other law enforcement officers.

(7)    From 9:30 to 11:30 p.m., Agent Howard travels to his office, prepares his affidavit, obtains United States Attorney's office approval, presents it to a United States Magistrate Judge at his residence, and obtains a warrant to search the airplane.

(8)    At midnight, the airplane is searched under the just-issued warrant.

We now examine the authority of law enforcement officers to detain Massi and Sanchez during the course of this approximately six-hour period.

*A. Ramp Check and* Terry *Stop*

7

Massi does not argue that the regulatory inspection of a ramp check was improper. Such a regulatory inspection is not a detention under the just-described *Berry* formulation of citizen-police contact. *Id.* Therefore, we consider the issue of suppression to turn solely on what occurred after the ramp check. In so doing, we recognize that no specific occurrence demarks when the activities relating to the ramp check ended and a broader investigation commenced. Instead, as the investigation continued for purposes well beyond the regulatory ones justifying a ramp check, we must apply other relevant legal authority.

Massi contends that continuing the stop was not based on articulable, reasonable suspicion as required for an investigatory stop within the second tier of citizen-police contact. The validity of investigatory stops is governed by the standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). Police may detain an individual if the officer has a reasonable suspicion based on specific and particularized facts that the person is involved in criminal activity. *Id.* at 21-22, 27. Our *Terry* inquiry involves examining whether the initial action was justified and, then, determining whether any subsequent action was reasonably related in scope to either the circumstances that justified the stop or to dispelling a reasonable suspicion that developed during the stop. *United States v. Brigham*, 382 F.3d 500, 506-07 (5th Cir. 2004) (en banc). "Any analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999).

The facts leading to a finding of reasonable suspicion do not have to be based on a law enforcement officer's personal observation, but can also arise from the "collective knowledge" of law enforcement entities, so long as that

knowledge gives rise to reasonable suspicion and was communicated between those entities at the time of the stop. *See id.* at 759-60.

There is no clear evidence as to the timeline starting with Massi and Sanchez's return to the airplane between 6:00 and 6:30 p.m., and the arrival of Agent Howard at about 7:30 p.m. The reasonable suspicion arose from AMOC's information and was that the airplane was being used to transport drugs. In evaluating what happened at the scene, our caselaw requires "both the scope and length of the officer's investigation to be reasonable in light of the facts articulated as having created the reasonable suspicion of criminal activity." *United States v. Pack*, 612 F.3d 341, 357 (5th Cir. 2010).

We conclude that sufficient reasonable suspicion existed to justify an investigatory stop under *Terry*, which augmented the right to investigate that arose from the ramp check. AMOC's suspicions arising from the flight pattern were augmented by information concerning Massi's recent travel to Tijuana, Mexico, a known hub of the illegal drug trade. A third factor was the prior drug trafficking conviction of the airplane's registered owner. It is true that these facts were passed along by AMOC and were not learned as a result of direct law enforcement contact. Nonetheless, the obligation to submit to a ramp check allowed the airplane and Massi to be held at the airport initially. The law enforcement officers then had a proper basis to continue the encounter beyond the regulatory ramp check under the reasonable suspicion standard in *Terry*, even if the facts giving rise to suspicion were known prior to law enforcement contact with Massi.[2] The suspicion of a drug crime, either having been committed or still ongoing, was not dispelled and permitted the encounter to continue beyond the temporal confines of the ramp check.

---

[2] No argument is made that the ramp check was invalid as pretextual. This court has already rejected the argument that the motives underlying a ramp check could invalidate what would otherwise have been a proper inspection. *Zukas*, 843 F.2d at 182 n.1.

*B.* De Facto *Arrest and Probable Cause*

Massi next argues that the duration of his detention constituted a *de facto* arrest. A detention initially authorized by *Terry* can, due to its duration, transform into the equivalent of an arrest. *United States v. Zavala*, 541 F.3d 562, 579 (5th Cir. 2008). If Massi's detention continued beyond the bounds permitted by a finding of reasonable suspicion under *Terry*, it "must be accompanied by probable cause" to believe that Massi had committed a criminal offense. *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007).

*1.* Terry *stop becoming an arrest*

We first examine whether Massi's detention under *Terry* "morphed . . . into a de facto arrest" and, if so, when that arrest occurred. *Zavala*, 541 F.3d at 579. An arrest occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). As a factual matter, we know that Massi and Sanchez were told by law enforcement officers that they were not free to leave. The issue is solely a legal one.

At the end of the officers' investigation, the following was known: (1) the trip had been laborious – six refueling stops – from Orlando to Las Vegas, then after a 12 hour stop, the return trip began; one of the occupants had just entered the country through Tijuana, Mexico, a known center of drug activity; and the owner of the airplane had a more-than-twenty-year-old conviction for drug trafficking; (2) a canine, Gus, conducted a sniff of the airplane's exterior at 7:20 p.m., including the luggage, and did not alert; (3) Massi and Sanchez complied with all requests, except each denied consent to search the airplane; (4) when Massi denied consent, he attempted to shut the airplane's open door; (5) Agent Knight saw a cardboard box behind the rear seat of the airplane, 18 to 24 inches across in size; (6) Sanchez told Agent Knight he had seen Massi

put the box in the airplane; (7) Massi denied knowing about the box; and (8) once told what Sanchez said, Massi admitted to owning the box. No further questioning occurred, because by then Massi had requested an attorney.

The final event in this chronology appears to have been the canine sniff at 7:20 p.m. Agent Howard arrived at 7:30 p.m. A fair estimate is that Massi and Sanchez's encounter with MPD began once they had time to return to their airplane after getting food, and once the officers had time to arrive at the airplane upon being told at 6:00 p.m. to conduct a ramp check. The Homeland Security agents were not informed of the airplane until 6:20 p.m., so their start was later than that of MPD. It would appear that the encounter had been underway for about an hour by the time Agent Howard arrived.

We noted above that we review the evidence on a motion to suppress in a manner favorable to the prevailing party, *Cardenas*, 9 F.3d at 1147, and uphold the ruling "if there is any reasonable view of the evidence to support it." *Michelletti*, 13 F.3d at 841 (quotation marked omitted). There are uncertainties in the record regarding the length of time taken by the ramp check, a check which independently supports the initial activity at the airplane. We have also found that there were reasonable suspicions of drug activity supporting some additional inquiry. Therefore, we see no clear factual error or any legal error in the district court's ruling that at least at the time that Agent Howard arrived, no violation of Massi's Fourth Amendment rights had occurred.

The remaining concern, of course, is that probable cause to arrest was absent as of 7:30 p.m., but Massi continued to be detained. The detention lasted until midnight, four and one-half hours after Agent Howard's arrival. From 7:30 to 9:30 p.m., Agent Howard collected and analyzed all facts uncovered during the regulatory check and *Terry* investigation. Between

9:30 p.m. and midnight, Howard went to his office; prepared an affidavit; talked at least with AMOC, the United States Attorney's office, and a Magistrate Judge; procured a search warrant; and returned to search the airplane's interior. During all this time, Massi was not free to leave.

This delay existed, ultimately, because law enforcement officers sought a warrant and warrants take time. A *Terry* detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Brigham*, 382 F.3d at 507. Our caselaw presents numerous examples of automobile searches, and occasionally searches of airplanes, in which the issue is whether immediate, warrantless searches were justified by exigent circumstances. Here, law enforcement officers instead held the airplane and the occupants until evidence could be corroborated, an affidavit prepared, and the search warrant obtained. As a result of the delay that accompanied this process, the initial investigatory stop "morphed from a *Terry* detention into a de facto arrest" requiring probable cause. *Zavala*, 541 F.3d at 579. Though the ramp check and *Terry*-justified investigation were over by 7:30 p.m., Massi had to remain until midnight while a warrant was obtained. Thus, both men were detained well beyond the time for the ramp check and *Terry* investigation.

Generally, absent the brief and minimally intrusive detention such as permitted under *Terry*, a seizure without probable cause to believe the person is guilty of a crime violates the Fourth Amendment. *Dunaway v. New York*, 442 U.S. 200, 210 (1970). "[W]e have never held that a police officer may detain a defendant for one hour and thirty minutes until a full-blown drug investigation is completed." *Zavala*, 541 F.3d at 580. We conclude that the justification under Terry to hold Massi had ended by 7:30 p.m. when Agent Howard arrived. Thereafter, Massi was under arrest.

### 2. Probable cause for an arrest

Massi's *de facto* arrest must be supported by probable cause. "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232 (1983). "We must also be mindful that probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers. We weigh not individual layers but the laminated total." *United States v. Edwards,* 577 F.2d 883, 895 (5th Cir. 1978) (en banc) (quotation marked omitted).

The facts and circumstances known to law enforcement by the time of Agent Howard's 7:30 p.m. arrival were all that was known until the midnight search of the airplane. Officers at the scene knew that the airplane had displayed suspicious flight activity; that the airplane's owner had a prior conviction for drug trafficking; and that Massi had acknowledged traveling from Tijuana, Mexico into the United States three days before the airplane left Las Vegas, Nevada. As the investigation progressed, these officers witnessed Massi's attempt to close the airplane door after his denial of consent to search, the existence of a cardboard box behind the rear seat of the airplane, and Massi's inconsistent statements as to his knowledge and ownership of the box. The question for us is whether such evidence constituted probable cause to arrest Massi and keep him at the airport in excess of four more hours. The Government has primarily argued that this evidence supports probable cause to search the aircraft. That is a separate question that we discuss later.

*Zavala* is again instructive. Finding probable cause absent there, we noted: "Although [the defendant and his passenger] gave conflicting answers to several interview questions, this could not serve as the catalyst to convert

13

mere reasonable suspicion into probable cause." *Zavala*, 541 F.3d at 575 (quotation marks omitted). While we do not require new facts be developed in order to transform reasonable suspicion into probable cause, we do require that "the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." *Zavala*, 541 F.3d at 575. There needed to be probable cause to believe that Massi was guilty of a drug-related offense, but we conclude that until the midnight search, all the officers had were suspicions.

We conclude that Massi was subject to an unconstitutional seizure at the airport. The issue on appeal, though, is not the existence of a constitutional violation in isolation but whether the evidence obtained as a result of the midnight search pursuant to a warrant should be suppressed. To link the unconstitutional seizure to the eventual search, Massi argues that the search warrant was the fruit of a tree poisoned by the unconstitutional detention. The Government argues that the detention is irrelevant, as the search that discovered the evidence, undertaken pursuant to a warrant, was valid at a minimum under the good faith exception to the exclusionary rule. We now turn to the resolution of those competing views.

## II. *Interaction of Good Faith Exception and Fruit of the Poisonous Tree Doctrine*

The good faith exception to the exclusionary rule provides that "evidence obtained during the execution of a warrant later determined to be deficient is nonetheless admissible if the executing officer's reliance on the warrant was objectively reasonable and made in good faith." *United States v. Woerner*, 709 F.3d 527, 533 (5th Cir. 2013) (citing *Leon*, 468 U.S. at 921-25). Applying the good faith exception does not resolve whether a constitutional right has been

violated; it simply is a judicial determination that exclusion of evidence does not advance the interest of deterring unlawful police conduct. *Leon*, 468 U.S. at 906-07 (citing *Gates*, 462 U.S. at 223). In effect, the good faith exception limits the remedy of exclusion where "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Leon*, 468 U.S. 922.

Typically, this court conducts a two-step review of a district court's denial of a motion to suppress evidence seized under a warrant. *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1129 (5th Cir. 1997). "The first step requires the court to determine whether the good-faith exception to the exclusionary rule applies." *Id.* "The second step requires the court 'to ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed.'" *Id.* (quotation marks omitted). "If the good-faith exception applies, the court need not reach the question of probable cause." *Id.* at 1130 (citations omitted). "Principles of judicial restraint and precedent dictate that, in most cases, we should not reach the probable cause issue if . . . the good-faith exception of *Leon* will resolve the matter." *United States v. Craig,* 861 F.2d 818, 820 (5th Cir. 1988). In this appeal, we are presented with different circumstances from those traditionally animating this two-step analysis. The Government is asking us to determine whether the good faith exception to the exclusionary rule applies when the search warrant was used on an airplane whose pilot and passenger had several hours earlier been seized in violation of their Fourth Amendment rights.

The question of whether the good faith exception can permit the admissibility of evidence over a possible taint caused by an earlier-in-time detention in violation of the Fourth Amendment that would otherwise warrant

exclusion as fruit of the poisonous tree, is not territory frequented in our jurisprudence.[3]  We recently discussed whether the good faith exception is applicable when "the magistrate's probable cause finding is based on evidence that was the product of an illegal search or seizure."  *Woerner*, 709 F.3d at 534.  There, the court considered whether evidence obtained as a result of the execution of a search warrant should be suppressed where the affidavit included information gained from a defendant during a custodial interrogation that was later suppressed as the fruit of an earlier-in-time, unlawful search.  *Id.*  Both the interrogation and unlawful search were undertaken by a different law enforcement entity than that of the officers who pursued the search warrant at issue; the two investigations were parallel and the officers seeking the search warrant did not know of the other officer.  *Id.*  Such separation did not exist here between the improper detention and the processing of the search warrant.

Also relevant to *Woerner*'s analysis was an assessment of the objective good faith of the law enforcement officer in pursuing the warrant.  *See id.*  We concluded, under the circumstances presented, that suppression was not justified and that the good faith exception applied.  *Id.* at 535.  While differing from Massi's scenario in both the context – an unlawful search – and the existence of a parallel investigation, *Woerner* signals an openness to applying the good faith exception where an earlier-in-time constitutional violation exists alongside a search warrant that was sought and executed in good faith.

---

[3] We say "possible taint" because there is not a clear causal connection between the unconstitutional detention and the acquisition of evidence used to support the search warrant.  We have found that the evidence used to obtain the search warrant was acquired but not fully corroborated for the purposes of Agent Howard's affidavit prior to the improper detention.  The unconstitutional detention did allow the plane and its occupants still to be at the airport for the midnight warrant to be executed, so there is that clear link.  We will discuss the issue as if the fruit of poisonous tree doctrine applies.

We will discuss the details of the good faith exception momentarily. To understand *Woerner*, though, we need to give a brief summary of those principles. The Supreme Court in *Leon* identified four situations, or "exceptions," that would prevent admission of evidence obtained through a search warrant: the affiant misled the magistrate who issued the warrant; the magistrate "abandoned his judicial role"; the affidavit is patently inadequate to show probable cause; or the warrant is so deficient on its face that officers could not presume its validity. *Leon*, 468 U.S. at 921-25. The *Woerner* court stated that the facts of that case required it "to answer whether the good faith exception applies in a fifth situation: when the magistrate's probable cause finding is based on evidence that was the product of an illegal search or seizure." *Woerner*, 709 F.3d at 534. The court did not answer the question of whether a fifth exception should be recognized. Instead it held that the facts did not support that the magistrate had acted on information that was tainted: "the police misconduct leading to the inclusion of [the illegally obtained statements in the] warrant application was at most the result of negligence of one or more law enforcement officers." *Id.* at 534-35. As we will discuss later, we conclude that a preferable way to consider facts such as these is not as a fifth exception but as a corollary to the first exception – did the affiant mislead the magistrate?

The dissent notes distinctions between *Woerner* and the current case, and from those distinctions concludes that a different result is required. Distinctions do not always make a difference, and these do not. It is true that Agent Howard and his agency, ICE, were involved throughout that evening, while in *Woerner* there were two different though parallel investigations by different officers. The observation is made in *Woerner* that "if the officer applying for the warrant knew or had reason to know that the information was

tainted . . . then suppressing the evidence seized pursuant to the warrant 'pay[s] its way by deterring official lawlessness.'" *Woerner*, 709 F. 3d at 534 (quoting *Gates*, 462 U.S. at 258 (White, J. concurring)).  As we will discuss, we do not agree that Agent Howard's knowledge of what transpired at the airport equates to knowledge that what occurred was unconstitutional.  We will also discuss that Agent Howard's affidavit disclosed the basic facts of the delay, that delay being the source of the alleged taint to the later search.  There was no misleading of the magistrate.

Other circuits have considered similar scenarios.  The Sixth, Second, and Eighth Circuits have concluded that in certain circumstances, the good faith exception can overcome a taint from prior unconstitutional conduct.  *See United States v. McClain*, 444 F.3d 556, 564-566 (6th Cir. 2005) (finding that "the *Leon* good faith exception should apply despite an earlier Fourth Amendment violation"); *United States v. Fletcher*, 91 F.3d 48, 51-52 (8th Cir. 1996) (finding that the *Leon* exception was applicable to a subsequent warrant-authorized search of luggage when the initial detention of the luggage was a Fourth Amendment violation); *United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985) (finding *Leon* applicable to a warrant-authorized search of an apartment where the affidavit supporting the warrant contained evidence obtained in violation of the Fourth Amendment).  The Ninth and Eleventh Circuits, though, have held that the good faith exception does not apply where a search warrant is issued on the basis of evidence that is fruit of the poisonous tree.  *See United States v. McGough*, 412 F.3d 1232, 1239-40 (11th Cir. 2005); *United States v. Vasey*, 834 F.2d 782, 789-90 (9th Cir. 1987).

One of the recent cases to address this issue is persuasive.  *See McClain*, 444 F.3d 556.  There, the Sixth Circuit stated that it must "reconcile the 'good faith' exception established in *Leon* . . . with the 'fruit of the poisonous tree'

doctrine first coined in *Nardone v. United States*, 308 U.S. 338, 341 (1939)." *Id.* at 564. "[P]articularly instructive" was the Eighth Circuit's explanation of *Leon* that "evidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid." *McClain*, 444 F.3d at 566 (quoting *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989)). As in the Eighth Circuit's decision, the *McClain* court "refused to apply the exclusionary rule because the facts surrounding the initial Fourth Amendment violation were 'close enough to the line of validity to make the officer's belief in the validity of the warrant objectively reasonable.'" *McClain*, 444 F.3d at 566 (quoting *White*, 890 F.2d at 1419).

In *McClain*, officers had responded to a neighbor's call about a light on in a house that was supposed to be unoccupied; after initial inspection outside discovered an open door, the officers entered the house to determine if there had been an intruder. *Id.* at 560. That entry, which uncovered evidence of a marijuana grow operation but no drugs themselves, was later found to be invalid. *Id.* at 561. The evidence formed the basis for an investigation, search warrant, and later entry that uncovered 348 marijuana plants and growing equipment. *Id.* at 560. The Sixth Circuit found that the good faith exception applied to permit the admissibility of evidence obtained as a result of the search warrant's execution despite the taint that resulted from the unconstitutional initial entry of the house. *Id.* at 566. In considering that initial entry, the *McClain* court concluded that it "did not believe that the officers were objectively unreasonable" in believing that criminal activity was afoot and there was "no evidence that the officers knew they were violating the Fourth Amendment" in conducting their warrantless activity. *Id.* The court emphasized that, "importantly, the officers who sought and executed the

search warrants were not the same officers who performed the initial warrantless search, and [the officer's] warrant affidavit fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search." *Id.* The court determined:

> Because the officers who sought and executed the warrants acted with good faith, and because the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable, we conclude that despite the initial Fourth Amendment violation, the *Leon* exception bars application of the exclusionary rule in this case.

*Id.* We adopt the following reasoning, drawing on *McClain,* as our understanding of the interaction of the doctrine of fruit of the poisonous tree with *Leon*'s good faith exception, as each apply to evidence obtained as the result of the execution of a search warrant. Two separate requirements must be met for evidence to be admissible: (1) the prior law enforcement conduct that uncovered evidence used in the affidavit for the warrant must be "close enough to the line of validity" that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant was not tainted by unconstitutional conduct, and (2) the resulting search warrant must have been sought and executed by a law enforcement officer in good faith as prescribed by *Leon.*

The dissent here insists that a necessary element of this interaction between good faith use of a search warrant and a taint to the evidence supporting the warrant is that the officers engaged in the prior conduct be different than those who acquire the warrant. It argues that our review of *McClain* makes a "glaring omission" in failing to recognize the importance of the fact that "the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search." *Id.* at 566.

We see no basis for creating such a requirement, though the precedents we have cited have those facts. What is important is that the officer presenting the information to a magistrate be objectively reasonable in concluding that the information being used to support the warrant was not tainted. It is not awareness of the existence of the conduct that later is found to be improper that is important, but awareness at the time of presenting the affidavit that the conduct violated constitutional rights that would affect the application of the good faith exception.

*A. Objectively Reasonable Belief in the Validity of Prior Police Conduct*

We turn to whether it was objectively reasonable for the officer executing the search warrant to believe that Massi's detention was valid. Agent Howard was the law enforcement officer who sought and executed the search warrant. Unlike the warrant-seeking officers in *McClain*, Agent Howard was present during some of Massi's detention and, therefore, was present while the constitutional violation occurred. We analyze whether an objectively reasonable officer who assumed a role in an ongoing investigation, obtained a search warrant, and executed that search warrant would have been aware of the constitutional invalidity of this detention.

Upon Agent Howard's 7:30 p.m. arrival at the airport, there was no reason for him objectively to believe that any improper law enforcement conduct occurred prior to his arrival. Indeed, we have held that there was no such conduct. Howard did not initiate and continue the encounter for the purpose of eventually gaining sufficient new information to use in obtaining a search warrant. Rather, at 7:30 p.m. he joined a completed investigation during which no constitutional violation had occurred.

Turning next to whether Agent Howard should have been aware of an invalidity as a result of continued detention (post-7:30 p.m.) arising from the

warrant-preparing process, we note the absence of precedent on holding suspects and their "vehicle" in order to prepare a proper warrant request, as opposed just to searching under exigent circumstances without a warrant. We are addressing those issues for one of the first times in this circuit. It is clear that detention cannot be prolonged just to investigate, but Agent Howard was corroborating information already known by law enforcement in order to be the affiant when requesting a search warrant. We earlier observed that Agent Howard's testimony was somewhat ambiguous, first asserting three things he knew early on but then correcting some unstated part of that assertion. Regardless, we "should uphold the district court's ruling to deny the suppression motion 'if there is any reasonable view of the evidence to support it.'" *Michelletti*, 13 F.3d at 841 (citation omitted). The ruling of the district court, while determining Massi's detention not to be unconstitutionally prolonged, found in the alternative that the good faith exception would apply "because there was a relatively large amount of persuasive evidence presented to the magistrate judge, and Agent Howard subjectively believed he had acted in accordance with the law." We do not find that the ambiguity in Agent Howard's testimony prevents a reasonable view of the evidence that would support the district court's ruling as to the applicability of the good faith exception.

When Agent Howard arrived at the airport, it was objectively reasonable for an officer in his position to believe that no constitutional violation had yet occurred, that probable cause for a search existed, and that he was justified in taking the steps needed to confirm known facts, prepare an affidavit to present to a magistrate, and obtain a search warrant. Our examination of caselaw addressing unlawful detention does not clearly signal whether or how the delays inherent in obtaining a warrant interact with unlawful seizures under

the Fourth Amendment.  As *McClain* noted, "[s]ometimes the line between good police work and a constitutional violation is fine indeed." *Id.* at 563.

Complicating a reasonable officer's objective awareness is our prior observation that the "poisoned tree" of improper law enforcement did not cause the discovery of the evidentiary "fruit" summarized in the affidavit.  Massi's constitutional rights were violated when he was detained while the affidavit was prepared and a search warrant issued, but the evidence relied upon by the affidavit had been uncovered prior to then.

The prolonged detention was "close enough to the line of validity" that an objectively reasonable officer preparing the affidavit for the warrant would believe in the validity of the prior conduct.

*B.* Leon *Exceptions to the Good Faith Exception*

We next consider whether the search warrant executed by Agent Howard was properly obtained and executed so as to be within the ambit of the good faith exception.   In *Leon,* the Supreme Court identified four situations in which the good faith exception to the warrant requirement does not apply:

> (1) when the issuing magistrate was misled by information in an affidavit that the affiant knew or reasonably should have known was false; (2) when the issuing magistrate wholly abandoned his judicial role; (3) when the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable; and (4) when the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid.

*Woerner,* 709 F.3d at 533-34 (citing *Leon,* 468 U.S. at 921-25).  In determining whether the good faith exception applies, "we do not attempt an 'expedition into the minds of police officers' to determine their subjective belief regarding the validity of the warrant." *United States v. Payne,* 341 F.3d 393, 400 (5th Cir. 2003) (quoting *Leon,* 468 U.S. at 922 n.23).  Rather, the analysis "is

confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id* (quotation marks omitted).

Massi's arguments about the good faith exception discuss only the third and fourth *Leon* scenarios. We similarly limit our analysis but also address an implicit argument that arises from the fruit of the poisonous tree doctrine.

### *1. The affidavit's indicia of probable cause and the reasonableness of official belief in the existence of probable cause*

Massi states that the affidavit was merely "bare bones," contained conclusory statements, and lacked the richness of detail necessary for the establishment of probable cause such that no reasonable officer could have reasonably relied on it. He argues that the sole corroborated fact which was brought to the attention of the warrant-issuing magistrate was the airplane's suspicious flight pattern.

The reasonableness of an officer's reliance on a warrant is a question we review *de novo*. *United States v. Wylie,* 919 F.2d 969, 974 (5th Cir. 1990). "When a warrant is supported by more than a 'bare bones' affidavit, officers may rely in good faith on the warrant's validity." *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992). "'Bare bones' affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *Id*.

In reviewing the affidavit, we agree with the district court's assessment that it contains "ample evidence" and find that its content was sufficient to permit a reasonable officer to rely on the resulting warrant. Agent Howard provided information based on his observations as well as those of other law enforcement officers. He described the suspicious flight pattern; the resultant ramp check and Massi's response to a requested search; the prior conviction of the airplane's owner for cocaine trafficking and money laundering; Massi's

travel to Tijuana, Mexico in the days prior to his boarding the airplane; the existence of a cardboard box inside the airplane; and the contradictory statements about the ownership of the box. Taken collectively, these facts are far from a "bare bones" recitation of conclusory statements. Rather, they represent an assemblage of facts discovered during the investigatory stop that were corroborated by Agent Howard and were appropriately presented and considered as probable cause to proceed with the process of obtaining a warrant to search the airplane.

### 2. Facial deficiencies of the warrant and an executing officer's reasonable presumption of validity

Massi also argues the good faith exception is inapplicable under the fourth *Leon* scenario, where a warrant fails "to particularize the place to be searched or the things to be seized" and "the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. The warrant specified that the 1990 Mooney M20J airplane with tail number N201SE was to be searched for evidence of a crime, contraband, fruits of a crime, or other items illegally possessed. Further, the warrant incorporated the facts in Agent Howard's affidavit and its discussion of the airplane, the cardboard box within the airplane, and the facts that supported the probable cause finding that led to the issuance of the warrant. The warrant was sufficient in its particularity to permit an executing officer to presume it to be valid and thereby forecloses Massi's challenge to the warrant's facial sufficiency.

### 3. The good faith exception and the fruit of the poisonous tree doctrine under Leon

Our analysis of the good faith exception, first under *McClain* and then under *Leon*, has separated those two lines of precedent. We find it equally valid, and perhaps simpler in concept, to join the two, focusing on the first element of *Leon*. We determine that this approach is consistent with both

25

cases, though we are chary to engraft anything onto settled Supreme Court precedent. Therefore, we undertake this final discussion as a means to understand the interaction of the good faith exception to the exclusionary rule and a warrant-executing officer's knowledge of an earlier-in-time constitutional violation that would invalidate the search warrant.

Had Agent Howard knowingly hidden or misrepresented the course and duration of the investigation at the airport to the magistrate judge, making him unaware of a constitutional violation, such action could be seen as equivalent to misleading the magistrate by falsities in the affidavit or statements that are in reckless disregard of the truth under the first *Leon* scenario. *See Leon,* 468 U.S. at 923. The first element of *Leon* focused on omissions or falsities that distort the finding of probable cause; we are suggesting that failure to acknowledge constitutional violations that led to the discovery of the evidence in the affidavit could similarly lead to the unavailability of the good faith exception under *Leon*.

We addressed a related argument in *Woerner*, considering whether an infirmity in the warrant existed if "the magistrate's probable cause finding is based on evidence that was the product of an illegal search or seizure." 709 F.3d at 534. That panel noted but did not hold that this issue could give rise to a fifth scenario in which the good faith exception would be inappropriate. *Id.* We conclude that the issue presented by Massi's circumstances is more easily considered under *Leon* by equating the misleading of the issuing magistrate as to a possible constitutional violation through an omission with the first *Leon* scenario, submission of an affidavit with affirmatively misleading information.

Considered under this paradigm, Agent Howard properly explained the timeline in his affidavit. He said that "at approximately [7:30 p.m. he] received

26

information about an airplane with suspicious flight patterns" that was parked at Midland International Airport.  He then recounted the events at the airport prior to his arrival that involved MPD and Agents Knight and Garnett. Though the specific time at which Massi's encounter with law enforcement began was not stated, it was clear from the affidavit that multiple interactions between law enforcement and the suspects occurred prior to 7:30 p.m. Additionally, the magistrate of course knew what time it was when he was ruling on the application.  We find nothing about the affidavit, through either affirmative statement or omission, to have been misleading about the length of Massi's detention.

Agent Howard did not have the benefit of our judicial hindsight as he worked to obtain and execute a search warrant.  To suppress the evidence derived from this warrant would not serve the interest of deterring future constitutional violations.  *See Leon*, 468 U.S. at 919-20.  The good faith exception to the exclusionary rule applies here where the search warrant, though ultimately obtained as a result of an illegal detention in violation of the Fourth Amendment, was obtained and executed by a law enforcement officer in good faith and under an objectively reasonable belief that it was valid and relied upon appropriately obtained evidence.  Under the good faith exception, the evidence obtained as a result of the execution of the search warrant was properly admitted.

AFFIRMED.

GRAVES, Circuit Judge, dissenting.

After a ramp check at the Midland airport and a more-than-six-hour detainment, during which time a canine failed to alert on any presence of narcotics on either the airplane or luggage, officers obtained a search warrant and found marijuana in a cardboard box behind the rear seat. The district court denied Matthew Joseph Massi's motion to suppress, finding that no constitutional violation had occurred and, alternatively, that a good faith exception to the exclusionary rule applies. The majority concludes that there was a constitutional violation, but affirms the denial of the motion to suppress by extending the good faith exception beyond that for which it was intended. I disagree and would conclude that the evidence should be suppressed because the duration and circumstances of Massi's prolonged detention transformed into a de facto arrest without probable cause. Further, I would conclude that the good faith exception is not applicable. Because I would reverse the district court's denial of Massi's motion to suppress, I respectfully dissent.

Massi asserts that he was illegally detained at the airport and that his detainment was unconstitutionally prolonged without probable cause. He does not argue that the ramp check itself was illegal, but asserts that he and the pilot should have been free to leave as soon as authorities checked the documents. He further asserts that his "prolonged seizure" exceeded the parameters of an investigative stop, resulting in an illegal arrest. Therefore, Massi asserts that all of the evidence seized by the authorities pursuant to the warrant should have been suppressed as the fruit of the poisonous tree.

The Government asserts that Massi was validly detained for a ramp check and a *Terry* stop, and that the detention did not become an arrest until a search warrant was issued and contraband was found. Alternatively, the

No. 12-51063

Government asserts that the evidence obtained pursuant to the search would still be admissible under the good faith exception to the exclusionary rule.

The majority concludes that sufficient reasonable suspicion existed to justify an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968), which allowed the investigation to continue beyond the ramp check. Specifically, the majority says that:

> [T]he obligation to submit to a ramp check allowed the airplane and Massi to be held at the airport initially. The law enforcement officers then had a proper basis to continue the encounter beyond the regulatory ramp check under the reasonable suspicion standard in *Terry,* even if the facts giving rise to suspicion were known prior to law enforcement contact with Massi.

I agree that there was sufficient reasonable suspicion to justify a *Terry* stop, but I disagree with this statement because there was no justification for the stop to continue beyond the initial ramp check and investigatory stop. I also disagree with any suggestion that facts known prior to law enforcement contact with a defendant not only allow a *Terry* stop, but also provide a basis for the stop to continue.

Investigative detention must last "no longer than required to effect the purpose of the stop." *United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006). "Once the purpose of a valid [*Terry*] stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is *additional* reasonable suspicion supported by articulable facts." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006) (emphasis added); *United States v. Machuca-Barrera*, 261 F.3d 425, 432 n.21 (5th Cir. 2001) (stating that questioning unrelated to the justification for a stop that extends the stop's duration violates the Fourth Amendment). Articulable suspicion means more than a hunch. *Terry*, 392 U.S. at 21-22. This court has considered *Terry* principles in the ramp check context. *See, e.g., United States v. Zukas*,

29

843 F.2d 179, 181-83 (5th Cir. 1988). An arrest has occurred if, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). A person is seized when, "by means of physical force or a show of authority, his freedom of movement is restrained." *Id*. at 553. Even short of an arrest, a person's "liberty interest in proceeding with his itinerary" may be "effectively restrain[ed]" if his personalty is detained for investigation. *United States v. Place*, 462 U.S. 696, 708 (1983).

In this situation, the ramp check and the *Terry* stop coincided. The majority concedes that the reasonable suspicion came from information received from the Air Marine Operations Center (AMOC). This was prior to and the basis for the ramp check, which was the investigatory stop. Upon the completion of the ramp check/*Terry* stop, there was no *additional* reasonable suspicion to justify the extension of the stop. *See United States v. Brigham*, 382 F.3d 500, 506-07 (5th Cir. 2004) (emphasis added). At that point, the detention should have ended. *See Estrada*, 459 F.3d at 631. The paperwork was in order and the authorities had no articulable suspicion of any illegal activity. But Massi and the pilot were already being detained and were not free to leave. The authorities then asked for and were denied consent to search and the canine failed to alert, further indicating that any suspicions had been dispelled.[1] That is the second point at which the detention should have ended.

There is nothing in the record to establish the existence of any evidence of criminal activity. There is also nothing in the record to indicate that

---

[1]I note that, while Massi did attempt to close the door of the airplane after denying consent to search, the door was actually closed by a law enforcement officer. The majority also refers to "Massi's inconsistent statements as to his knowledge and ownership of the box." Actually, Howard's affidavit states, and testimony supports, that Agent Knight asked Massi who the box belonged to and he responded: "I don't know what you are talking about." Knight asked Massi again and Massi said: "I don't know of any boxes." Knight then clarified that the reference was to the box the pilot saw him put in the plane and Massi admitted "[t]he box is mine."

authorities had anything more than a hunch that the men were involved in criminal activity.  A hunch does not create articulable suspicion.  *Terry*, 392 U.S. at 21-22.  There is nothing in the record to indicate that authorities asked the men about the flight activity, which authorities later deemed "suspicious," why they spent only 12 hours in Las Vegas, or about the purpose of Massi's recent visit to Tijuana.  Although Tijuana may be "a known center of drug activity," obviously, it is not illegal to visit Tijuana.  The record further indicates that evidence of "suspicious" flight activity was not conveyed by AMOC to authorities until after the ramp check and investigatory stop had been completed.  Agent Josh Howard, criminal investigator for U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), testified that AMOC initially requested a ramp check and informed Midland Police that the registered owner of the aircraft had a prior narcotics-related conviction.  With regard to the flight activity, Howard testified:  "Honestly, I don't recall if they told me exactly what was going on at the time, but I did – I did corroborate the information."  Howard also testified that much of his corroboration was done when he was back at his office writing the search warrant affidavit several hours later.

Notwithstanding the likelihood of the stop turning into a de facto arrest at an earlier point in time, the majority ultimately concludes that Massi's investigatory stop turned into a de facto arrest without probable cause at some point after Howard's arrival on the scene.  *See United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008).  In analyzing probable cause for an arrest, the majority states that the "facts and circumstances known to law enforcement by the time of Agent Howard's 7:30 p.m. arrival were all that was known until the midnight search of the plane."  But, as set out above, the record indicates that some of that information was likely obtained after Howard arrived and

after he returned to his office. Nevertheless, the majority concludes that until the midnight search, the officers only had suspicions and not probable cause for an arrest. However, after concluding that Massi was subjected to an unconstitutional arrest at the airport, the majority then opines that the evidence obtained pursuant to that unconstitutional arrest should not be suppressed as the fruit of the poisonous tree under the good faith exception.

As stated by the majority, the good faith exception provides that "evidence obtained during the execution of a warrant later determined to be deficient is nonetheless admissible if the executing officer's reliance on the warrant was objectively reasonable and made in good faith." *United States v. Woerner*, 709 F.3d 527, 533 (5th Cir. 2013). The exception involves a judicial determination that exclusion of the evidence does not advance the interest of deterring unlawful police conduct. *United States v. Leon*, 468 U.S. 897 (1994). The good faith exception limits exclusion where "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Leon*, 468 U.S. at 922. The good faith exception does not apply:

> (1) when the issuing magistrate was misled by information in an affidavit that the affiant knew or reasonably should have known was false; (2) when the issuing magistrate wholly abandoned his judicial role; (3) when the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable; and (4) when the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid.

*Woerner*, 709 F.3d at 534 (citing *Leon*, 468 U.S. at 923).

The majority characterizes the question here as whether the exception permits the admissibility of evidence over a "possible taint" caused by the

Fourth Amendment violation that would otherwise be excluded as fruit of the poisonous tree.  The majority indicates that it says "'possible taint' because there is not a clear causal connection between the unconstitutional detention and the acquisition of evidence used to support the search warrant."  But clearly there is a causal connection between the unconstitutional detention and the evidence obtained in the search since officers would not have been able to conduct the search absent the unconstitutional detention.  The authorities not only detained Massi and the pilot, but also their documents, luggage, and airplane.  Further, as stated above, there is evidence that all of the information used in the warrant was not acquired prior to the detention, as the majority concedes.

The majority acknowledges that *Woerner* is factually distinguishable, but says that it "signals an openness to applying the good faith exception where an earlier-in-time constitutional violation exists alongside a search warrant that was sought and executed in good faith."  *Woerner* involved two separate investigations of online activity by two separate agencies and two separate search warrants.  As the majority acknowledges, "[b]oth the interrogation and unlawful search were undertaken by a different law enforcement entity than that of the officers who pursued the search warrant at issue; the two investigations were parallel and the officers seeking the search warrant did not know of the other.  The majority says that, in *Woerner*, this court concluded that suppression was not justified and that the good faith exception applied.  While that statement is not inaccurate, a more fulsome discussion of *Woerner* is warranted.

On July 12, 2010, the Los Fresnos Police Department (LFPD) executed an expired search warrant on Woerner's residence and seized evidence of possession of child pornography.  The warrant came as a result of a profile

Woerner had posted on the file-sharing network Gigatribe and files he had shared with a detective in Illinois on April 14, 2010.  That detective traced the Internet Protocol (IP) address and reported the matter to LFPD.  During the same time period, the Federal Bureau of Investigation (FBI) was conducting a separate, unknown undercover operation on Gigatribe and accessed child pornography from the same IP address on May 14, 2010.  As a result, the FBI applied for and received a search warrant for Woerner's residence.  On July 13, 2010, FBI agents were preparing to execute this warrant when LFPD informed them of the earlier search and arrest.  The FBI proceeded with the search and seized film, videos, tapes, and magazines.  The following day, the FBI interrogated Woerner and subsequently took over the investigation, which involved subsequent searches, including a search of an email account (the fantastikaktion account).

Prior to trial, Woerner moved to suppress evidence.  The district court found, in part, that the good faith exception did not apply and suppressed all of the evidence seized from Woerner's home by the LFPD pursuant to an expired search warrant and the subsequent statements that he made to the FBI in the parallel investigation on the grounds that the "evidence was seized pursuant to, and his statements were tainted by, the unlawful July 12 search of his home." *Woerner*, 709 at 533.  However, the district court did not suppress evidence derived from the FBI's interview of a victim and his family or later search of Woerner's residence or fantastikaktion account, concluding that the evidence fell within the good faith exception to the exclusionary rule.  *Id.*

Woerner appealed, arguing, in part, that the emails from the fantastikaktion account should have been suppressed because the later warrant was supported by evidence obtained through the earlier unlawful search.  This court affirmed the district court's application of the good faith

exception in denying the suppression of only this later evidence obtained through a later warrant based, in part, on statements Woerner had made during the custodial interrogation linking his possession of child pornography to the fantastikaktion account.  In doing so, this court said:

> We decline to announce a categorical rule governing this situation, following *Leon's* guidance that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." . . . We note that the purpose of the exclusionary rule – deterring future Fourth Amendment violations – would be served, in some cases, by suppressing evidence seized pursuant to a warrant supported by evidence obtained through an unlawful search. . . . For example, if the officer applying for the warrant knew or had reason to know that the information was tainted and included it anyway without full disclosure and explanation, then suppressing the evidence seized pursuant to that warrant "pay[s] its way by deterring official lawlessness."

*Woerner*, 709 F.3d at 534.  (Internal citations omitted).

Based on *Woerner*, the evidence here should clearly be suppressed. Howard and his agency were involved in this investigation the entire time and he knew exactly what had occurred.  This is akin to the first warrant in *Woerner* in which the evidence was suppressed and the good faith exception did not apply.  As established previously herein, Howard's reliance on the warrant was not objectively reasonable or made in good faith.  Howard's affidavit to the warrant was misleading in that it fails to disclose that the investigation began at approximately 6 p.m. and Massi had been detained for more than an hour prior to 7:30 p.m., which is the time Howard states that he received initial information.  Howard testified during the suppression hearing that Midland Police were contacted at 6 p.m. and his agency was brought into the investigation at approximately 6:20 p.m.  Although Howard did not arrive

on the scene until approximately 7:30 p.m. because he had been at a personal function, other agents were already on the scene and Howard had already spoken to another agent and AMOC prior to his arrival.  Not only does Howard's affidavit for the warrant not contain relevant information regarding the time period of the investigation or of the unconstitutional arrest, but it also fails to state what information was actually known prior to the investigatory stop or what information was obtained after the unconstitutional arrest had already occurred.  Because he knew what had occurred, Howard could not rely in good faith on the warrant's validity.

Further, even with the omissions and misleading information, the warrant is lacking in indicia of probable cause and fails to particularize the things to be searched.  The affidavit contains generalized statements regarding drug trafficking and the common practices of traffickers, and a general list of items to be seized, i.e., "all evidence, fruits and instrumentalities pertaining to violations of Title 21 United States Code, Sections 841. . . ."  There is very little specific information in the affidavit other than things such as:  some of the flight information; the denial of consent to search; the observation of a "cardboard box approximately 18 to 24 inches across" behind the rear seat and the discussion regarding the box;  that Massi crossed from Tijuana three days before;[2] that the registered owner of the aircraft is Vernon Tynes and that he had a cocaine trafficking offense in 1992; and conclusory statements, such as "[t]his flight requires approximately 6 refuelings."

The majority concedes that an "unconstitutional seizure" occurred.  As a direct result of that constitutional violation, authorities obtained a search warrant and tainted evidence.  Exclusion of that tainted evidence would

---

[2] I note that the affidavit states that "[q]ueries of government databases revealed Massi crossed from Tijuana, Baha California, Mexico to San Ysidro on May 13, 2012."

certainly advance the interest of deterring unlawful police conduct in the form of detaining a person for more than six hours without probable cause in an attempt to pursue an investigation to develop probable cause. Because the benefits produced by suppressing the evidence here are not merely marginal or nonexistent and do justify the costs of exclusion, the good faith exception does not apply. *Leon*, 468 U.S. at 922.

Notwithstanding that I would find that the good faith exception does not apply under *Woerner* and *Leon*, I will address the other cases cited by the majority from the Sixth, Second and Eight Circuits. What is clear, as the majority acknowledges, is that these other circuits have only applied the exception in limited circumstances, none of which exist here.

The majority finds *United States v. McClain*, 444 F.3d 556 (6th Cir. 2005), to be most persuasive. But a careful examination of the facts in *McClain* undermines its persuasiveness. The initial entry into the house based on the erroneous belief by the police of possible criminal activity did not uncover any marijuana plants. In the initial entry, officers discovered inward-facing reflective paper on the windows in the basement, a large amount of electrical wiring connected to a junction box, what appeared to be plant stimulators, and some boxes marked "grow lights." Officers did not see any marijuana in the house, but concluded that a grow house was being set up. *McClain,* 444 F.3d at 560. Following the entry, officers informed their supervisor, who contacted Officer Brian Murphy of the Sumner County Drug Task Force. Murphy then began an investigation that lasted approximately six weeks and involved surveillance of the house and several other properties. Murphy eventually obtained warrants to search the house and five other properties. The warrant affidavit relied in part on evidence obtained during the initial warrantless search. During that search, authorities recovered 348 marijuana plants and

growing equipment from the house. *Id.* The district court granted the defendants' motions to suppress, finding that the warrantless entry and search of the house violated the Fourth Amendment and that the good faith exception of the exclusionary rule did not apply. The government appealed, and the Sixth Circuit reversed.

The question before the Sixth Circuit was whether the good faith exception can apply in a situation in which the affidavit for the warrant is tainted by evidence obtained in violation of the Fourth Amendment. The court concluded that *McClain* was "one of those unique cases in which the *Leon* good faith exception should apply despite an earlier Fourth Amendment violation." *McClain*, 444 F.3d at 565. The court relied on *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989), for the proposition that "the facts surrounding the initial Fourth Amendment violation were 'close enough to the line of validity to make the officer's belief in the validity of the warrant objectively reasonable.'" *McClain*, 444 F.3d at 566. Specifically, the court said:

> [W]e do not believe that the officers were objectively unreasonable in suspecting that criminal activity was occurring inside McClain's home, and we find no evidence that the officers knew they were violating the Fourth Amendment by performing a protective sweep of the home. *More importantly*, the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search, and Officer Murphy's warrant affidavit fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search.

*Id.* (Emphasis added). The court then found that:

> Because the *officers who sought and executed the search warrants acted with good faith*, and because the *facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants* objectively reasonable, we conclude that despite the Fourth

Amendment violation, the *Leon* exception bars application of the exclusionary rule in this case.

*Id.* (Emphasis added).

Based on *McClain,* the majority adopts the reasoning that two requirements must be met for the good faith exception to apply to evidence obtained as the result of the execution of a search warrant. The requirements adopted by the majority are:

> (1) the prior law enforcement conduct that uncovered evidence used in the affidavit for the warrant must be "close enough to the line of validity" that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant was not tainted by unconstitutional conduct, and (2) the resulting search warrant must have been sought and executed by a law enforcement officer in good faith as prescribed by *Leon.*

However, as set out above, that is not exactly what the Sixth Circuit said. Also, one glaring omission in the majority's newly-adopted reasoning involves the "more" important factor that the Sixth Circuit considered and I quoted above that, "the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search." *McClain*, 444 F.3d at 566. Despite that, the majority sees no basis for including this one requirement found to be of significant importance by the other circuits it cites. Instead, the majority says that, "[i]t is not awareness of the existence of the conduct that later is found to be improper that is important, but it is awareness at the time of presenting the affidavit that the conduct violated constitutional rights that would affect the application of the good-faith exception." Yet, the majority fails to reconcile that statement with its own finding that the prior police conduct was unconstitutional.

In this case, the officer who sought and executed the search warrant also participated in the unconstitutional arrest.  Detaining someone for hours until it turns into a de facto arrest without probable cause is not close enough to the line of validity to make any possible belief Howard had in the validity of the search warrant objectively reasonable.  The majority dismisses Howard's statements indicating he did not learn some necessary facts until after the unconstitutional arrest and cites *United States v. Michelletti*, 13 F.3d 838 (5th Cir. 1994) as support.  However, the portion of *Michelletti* quoted by the majority addresses the general standard for upholding the district court's ruling to deny a motion to suppress. *Id.* at 841.  Here, the majority has already held that the district court erred in finding the unconstitutional detention to be constitutional and is merely determining the application of a good faith exception. *Michelletti* provides no authority for the application of a good faith exception.

The majority cites the Eighth Circuit case of *United States v. Fletcher*, 91 F.3d 48, 51-52 (8th Cir. 1996), for the proposition that the *Leon* exception was applicable to a subsequent warrant-authorized search of luggage despite the initial Fourth Amendment violation.  In that case, upon his arrival at his destination, Fletcher's bag was delayed by the airline because of his last minute ticket purchase.  Fletcher left the airport and returned at a later time to retrieve his bag.  For various reasons, officers grew suspicious of Fletcher upon his initial arrival and began an investigation.  Upon Fletcher's return to the airport to retrieve his bag, officers approached him and began a conversation, during which Fletcher gave some contradictory statements.  Officers asked Fletcher for permission to search his bag.  Fletcher consented and then withdrew the consent.  Officers then told Fletcher he was free to leave but that his bag would be detained for a dog sniff.  The dog was brought in and

alerted on the bag.     Officers then obtained a search warrant and methamphetamine was discovered in the bag.  The district court held that the officers did not have reasonable articulable suspicion of criminal activity and that the detention violated the Fourth Amendment, but suppression was not warranted because the facts were "close enough to the line of validity to make the officers' belief in the validity of the detention and the validity of the search warrant objectively reasonable." *Fletcher*, 91 F.3d at 50.  Though factually distinguishable, a key point the Eighth Circuit made was that "officers collected information to *corroborate* their suspicions before approaching Fletcher by conducting additional surveillance and checking police records." *Id*. at 52.  (Emphasis added).

Here, officers did not corroborate their suspicions or check police records before approaching Massi.  Instead, officers corroborated their suspicions after they illegally detained Massi.  The process of "corroborating" information is typically part of the investigative process.  Further, officers did not conduct any additional surveillance.

The majority also cites *United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985), for the Second Circuit's finding that *Leon* was applicable to a search of an apartment where the affidavit in support of the warrant contained evidence in violation of the Fourth Amendment.  Again, this case is factually distinguishable as it involved a canine sniff outside a defendant's apartment that indicated the presence of narcotics and was used as probable cause to obtain a search warrant.  The search was part of an investigation that spanned a period of nine years and involved nine undercover investigations.  In any event, the Second Circuit found that, because the magistrate concluded that the canine sniff could form the basis for probable cause to search the apartment, there was nothing more the officer could have or should have done

to insure that his search would be legal.  Thus the good faith exception applied.  Specifically, the court said:  "The magistrate, whose duty it is to interpret the law, determined that the canine sniff could form the basis for probable cause; it was reasonable for the officer to rely on this determination."  *Thomas,* 757 F.2d at 1368.  That is clearly distinguishable from this case.

Further, there are Second, Eighth, Ninth and Eleventh Circuit cases that have held that the good faith exception does not apply where a search warrant was issued on the basis of tainted evidence.  *See United States v. Reilly,* 76 F.3d 1271, 1281-82 (2d Cir. 1996) (holding *Leon* inapplicable where officers failed to disclose in warrant affidavit the circumstances involved in a pre-warrant search; "Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble."); *United States v. O'Neal,* 17 F.3d 239, 243 n.6 (8th Cir. 1994) (issuance of search warrant could not sanitize prior illegal conduct in obtaining supporting evidence as it would not be a deterrent); *United States v. McGough,* 412 F.3d 1232, 1239-40 (11th Cir. 2005) (good faith exception does not apply where a search warrant is issued on the basis of evidence obtained as the result of an illegal search); and *United States v. Vasey,* 834 F.2d 782, 789-90 (9th Cir. 1987) (magistrate's issuance of warrant based on tainted evidence does not sanitize the taint).

The majority admits that Massi's constitutional rights were violated when he was detained while the affidavit was prepared and search warrant issued, but says, in effect, that the prolonged detention by Howard was close enough to the line of validity that Howard would believe in the validity of the illegal detention.  I disagree.

For the reasons stated herein, I would hold that the good faith exception does not apply.  Because I would reverse the district court's denial of Massi's motion to suppress, I respectfully dissent.